RUDD PAINT & VARNISH COMPANY, a corporation, and Chemtron Products, a Division of the Rudd Company, Appellants,

v.

Elizabeth H. WHITE and W. E. White, Jr., Appellees.

No. 10008.

United States Court of Appeals
Tenth Circuit.

Dec. 2, 1968.

Quincy D. Adams, Albuquerque, N. M. (Adams & Pongetti, Albuquerque, N. M., on the briefs) for appellants.

A. H. McLeod, Albuquerque, N. M. (Keleher & McLeod, Albuquerque, N. M., on the brief) for appellees.

Before PHILLIPS, HILL and SETH, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

This action was brought by Elizabeth H. White and W. E. White, Jr., against Rudd Paint & Varnish Company [1] and Chemtron Products, a Division of Rudd, seeking rescission of a contract entered into between them and Rudd on February 11, 1966, for the distribution rights in the State of New Mexico of Rudd's product, known as "Run Guard," and the recovery of $10,783.08 paid by them to Rudd for such distributorship and a substantial quantity of such product.

Rudd represented that the product was effective in preventing runs in ladies' nylon hose.

The product was to be furnished in two and one-half ounce and six and one-half ounce spray cans. Following execution of the contract, the Whites obtained 50 retail outlets for the product in Albuquerque, New Mexico. Upon delivery to them of the first shipment from Rudd, the Whites delivered to such retail outlets, pursuant to orders they had re-

1. Hereinafter called Rudd.

ceived from them, a supply of spray cans containing the product.

Shortly after the delivery of the product to the retail outlets, the Whites began to receive complaints that the spray element would not function. Thereupon, the Whites examined 663 two and one-half ounce cans in the retail outlets and found that in 203 cans, or in about 31 per cent of the cans examined, the spray element would not function. They replaced such defective cans.

They also checked six and one-half ounce cans they had delivered to retail outlets and found that the spray element in about 9 per cent of them would not function.

The Whites also checked cans of the products they retained in their unsold stock and found that in a large percentage of them the spray element would not function properly.

The contract provided that Rudd would furnish cans of the product to a group known as the Kelly Girls, to be passed out as samples. An examination made by the Whites of such sample cans, supplied by Rudd to the Kelly Girls, disclosed that the spray element in many of them was defective. In one case of 36 sample cans, the Whites found 16 in which the spray element would not function. In another case, the Whites found 18 cans in which the spray element would not function. Such defects made the cans unfit and unsuitable for distribution as samples.

Furthermore, many of the cans shipped to the Whites and the sample cans shipped to the Kelly Girls had leaked, causing discoloration and making unsightly the exterior of the cans.

The defects in the spray element and the leaks and resulting discoloration in a large percentage of the cans rendered the product shipped to the Whites by Rudd unmarketable, and the effect of the delivery of such defective cans to the retail outlets was harmful to the Whites' business reputation.

On discovery of the defects, the Whites promptly notified Rudd thereof, and of threats of the retail outlets to discontinue the sale of the product.

Rudd was aware that there were defects in many of the cans before the contract was entered into and at the time the shipment was made by Rudd to the Whites. When the Whites discovered that a large number of the cans were defective, W. E. White called Alan M. Park, the president of Rudd, and reported such facts to him. Park testified on direct examination at the trial below: "We acknowledged the fact that the two and a half-ounce cans that had gotten into the field were defective. We were at a loss, * * * as to why they were defective, but they were, nevertheless." On cross-examination, Park further stated: "I told you I have already testified that the specific cause of the leak is something that will probably always be a mystery, and I cannot tell you that shipping was the specific cause. No, these cans do leak and I can't tell you *way* [why]."

■ The Whites had a right to and did contemplate that the cans of the product in the initial shipment to them would be in a suitable condition for distribution and sale to the public, and that the sample cans would be suitable for distribution as samples to prospective purchasers.

The contract provided:

"12) * * * Company (Rudd) agrees to replace malfunctioning containers to Distributor (Whites) without cost to Distributor."

■ The case was tried to the court and it found the facts substantially as above stated. Its findings are supported by substantial evidence, are not clearly erroneous, and are binding on this court.[2]

---

2. Fed.Rules Civ.Proc. rule 52(a), 28 U.S.C.A.; Hill v. Field, 10 Cir., 384 F.2d 829, 831; Lindsey v. Oregon-Washington Plywood Co., 10 Cir., 287 F.2d 710, 711; Walker v. Wiar, 10 Cir., 276 F.2d 39, 41.

The trial court concluded that the shipment to the Whites by Rudd of a large quantity of the product for introduction in the New Mexico market in defective and unusable containers, with the knowledge by Rudd that such containers were defective and unusable, was a substantial breach of the contract and resulted in a failure of the consideration passing from Rudd to the Whites for the distributorship and entitled the Whites to rescission of the contract and the recovery of $10,747.08, being the amount paid by them to Rudd, less $36 received by the Whites for products sold.

Judgment was entered accordingly, and Rudd has appealed.

We do not think the provisions in the contract for replacement of malfunctioning containers by Rudd contemplated a situation where such a large portion of the containers was defective, as in the instant case. Moreover, many of the containers had leaked, resulting in discoloration of the cans and rendering them unsalable in the ordinary course of trade.

While the product, itself, may have been a useful one, it was unsalable unless enclosed in cans with elements whereby it could be sprayed on the hose and in containers free from discoloration.

Counsel for Rudd argue that there must be a substantial breach of a contract to warrant its rescission. We agree with that statement, but we think the facts in the instant case demonstrate that the product shipped to the Whites by Rudd clearly was not marketable in the ordinary course of business and constituted a substantial breach of the contract. Surely, the Whites could not afford to risk their business reputation by continuing to deliver to their retail outlets the product in spray cans, 30 per cent of which would not spray. Moreover, it is obvious that the Whites' retail dealers would discontinue handling the product, when they discovered the spray element would not function in such a high percentage of the cans. In such a situation, replacement of defective cans would not be a practical solution. Replacing such a high percentage of defective cans and checking every replacement can to be sure that it would function properly would place a heavy burden on the Whites and would be impractical from a business standpoint.

We conclude that the Whites were entitled to rescission of the contract and the recovery of $10,747.08 of the amount paid to Rudd.

Affirmed.