**Troy S. MORRIS, Plaintiff-Appellant,**

v.

**UHL & LOPEZ ENGINEERS, INC., Defendant-Appellee.**

No. 72–1226.

United States Court of Appeals, Tenth Circuit.

Oct. 5, 1972.

Sterling F. Black, Los Alamos, N. M., for plaintiff-appellant.

John R. Cooney, of Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, N. M. (Frank H. Allen, Jr., of Modrall, Sperling, Roehl, Harris & Sisk, Albuquerque, N. M., on the brief), for defendant-appellee.

Before SETH, BARRETT and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

This is a diversity case in which the plaintiff in a suit filed in United States District Court for the District of New Mexico sought damages for personal injuries which he sustained while working as a lineman near Los Alamos, New Mexico. The plaintiff-appellant had climbed a pole preparatory to its being replaced. He was seriously injured when the pole fell. Morris was an employee of Gottlieb Contracting, Inc. The pole was the property of the United States Atomic Energy Commission.

Appellee Uhl & Lopez had made a survey for the Commission and had reported on the condition of the electric facilities of the Commission, including pole 100, the one which fell. The United States, as owner of the facility, was joined as a defendant but is no longer in the case, a settlement having been reached with the appellant.

The alleged negligence of Uhl & Lopez, defendant-appellee, consisted of its having failed to expressly notify appellant as to the internally decayed condition of the pole. Gottlieb, appellant's employer, did not have a contract to replace the pole, but rather had contracted to do some line work in connection with it.

This cause was tried previously. On that first occasion the trial court found that Uhl & Lopez was guilty of negligence in failing to notify Morris of the unsafe condition of the pole. At the same time, the trial court found Morris guilty of contributory negligence which under New Mexico law is a bar to recovery. The cause was appealed to this court and was reversed and remanded for further proceedings solely in relation to the issue of contributory negligence.

See Morris v. Uhl & Lopez Engineers, Inc., 442 F.2d 1247, 1253 (10th Cir. 1971).[1]

The court at the first trial determined that appellant had failed to comply with the safety standards adopted and recognized by the industry and union and designed for the workman's own protection. The evidence established that a fellow workman had at the time that appellant undertook to climb the pole previously mounted it. It was unclear from the record whether the mentioned safety regulations applied to a fact situation in which another lineman had already climbed the pole and was then on it. On remand this specific issue was tried extensively, and the court determined from the evidence that the standards and practices of the lineman's trade apply fully even though a journeyman lineman is already on the pole.[2]

■ Despite the limited scope of the mandate of this court, the second trial did not limit itself to the applicability of the standards and practices mentioned; there was also received extensive evidence bearing on the contributory negligence of appellant as a matter of common law. This was offered and accepted by the trial court over the repeated objections of counsel for the appellant.

However, in view of the trial court's finding in respect to the narrow issue that was submitted to it on remand, and in view of the overwhelming weight of the evidence in support of the court's finding, we do not see prejudice in the action of the court in receiving evidence of contributory negligence on a broad scale. Our conclusion is that the judge's finding as to contributory negligence is fully supported by the evidence and, therefore, that the judgment must be affirmed.

Mention has been made here of the safety standards published by the union and approved and adopted by the industry. The evidence showed that this booklet, Exhibit 10, is customarily distributed to the linemen and is relied on in the field as an acceptable safety standard. This set of rules places burdens on a lineman to protect himself and, indeed, it allows him to refuse to climb a pole where hazard is present unless and until certain recognized precautions are taken.

First of all, as was pointed out in our prior opinion, electric utility poles are considered as presenting a possible risk of falling due to internal decay. This is especially true where the pole has not been treated with creosote.[3] In order to

1. In remanding the case for further proceedings solely in relation to the issue of contributory negligence, the court stated:

It may be that evidence is available to establish specifically and preponderantly that the general standards and practices as to detection tests and auxiliary evaluations recognizedly have application to the situation of successive mounting here involved. If this is not so established, however, the court's consideration of the question of contributory negligence necessarily must have confinement to a determination on the traditionally normal basis of whether Morris had exercised such general care or prudence as could ordinarily and reasonably be expected of a lineman in the circumstances of the situation.

2. On this the trial court said:

The general standards and practices of the lineman's trade require that a lineman, such as plaintiff, not climb a pole where the stress is to be changed until certain detection tests have been performed and/or the pole is braced, even though a trusted journeyman lineman is already on the pole, and the foreman has instructed the second lineman, such as plaintiff, to climb the pole.

3. Testimony demonstrated that some modern methods of pole preservation do not utilize creosote. However, in this region of the country, the practice is to treat poles with creosote. Also, at the time pole 100 was erected, creosote was the established preservative. Pole 100 was, it was testified, treated with creosote to ground level when erected, but subsequently dirt was filled in above that level and this produced rotting.

protect against such a hazard the lineman must make detection tests so as to ascertain the condition of the pole. One of these, according to the regulations, calls for striking the pole at or near its base with a hammer or a steel bar. A hollow sound is an indication of the existence of internal decay. Other tests to be made include whether the pole is covered with creosote. The litmus test calls for the drilling of the pole. Furthermore, in the regulations, if the stress or strain in the pole is to be altered, that is, if wires are to be removed, compensatory guying should be carried out so as to compensate for the alteration.

The evidence showed in the case at bar that appellant failed to make any of the prescribed tests. He merely visually inspected one side of the pole. No compensatory guying or counterbalancing was carried out. Appellant testified that the pole looked all right to him and that is as far as he went. This incident occurred June 26, 1965. Morris was instructed by his foreman to climb the pole for the purpose of performing some work at the top of it. A co-worker was already atop the pole. Also, appellant had loosened a three phase strand of wire which was 260 feet long and which extended in a southeasterly direction from pole 100. These wires exerted a stress of approximately 1,450 pounds. At the time that these wires were loosened by Morris prior to his climbing the pole, he knew they would be disengaged from pole 100 and that this would take place while he was on pole 100, so that whatever stress they exerted to the southeast would be eliminated. There were guy lines to the northeast but these exerted no balancing force; the pole was shown to have been rotten at ground level and to have fallen to the north. The evidence which the court found preponderant showed that the guy wires which are shown on the drawing appended to this opinion were in a northeasterly direction from pole 100, and that they exerted no stress or pressure which could have prevented the fall as their pull was in a predominately northerly direction. The pole fell just a few minutes after the change of stress resulting from the detachment of the wires to the southeast and after the appellant climbed the pole.

We gather from a reading of the record that the predominant factual cause was the internal rotting condition of the pole and that this, coupled with the change in stress, produced the fall. The pole here was an old one scheduled for replacement. It had not been fully treated with creosote, and admittedly appellant made none of the tests prescribed by either the Code of the International Brotherhood of Electrical Workers or the National Electrical Safety Code. As we view it, therefore, the findings of the court as to plaintiff's guilt of contributory negligence was and is fully supported by the evidence.

In accordance with the mandate of this court with respect to the applicability of the safety standards and practices to second or successive mountings, the court found that when the stress on a pole such as that involved here is to be changed, tests to detect rot are standard practice.[4]

---

4. On this the specific findings were:

    3. Plaintiff Morris knew, or should have known, that while he was on the pole, certain electrical lines going to the southwest [sic] were to be dropped from the pole, which would result in a significant change in stress on the pole.

    4. It is the general standard and practice in the lineman's trade that when the stress on a pole such as that referred to herein is to be changed, certain detection tests are performed to test for rot, and/or the pole is braced by one of several methods.

    5. At the time plaintiff Morris mounted the pole, there was on the pole a trusted, competent journeyman lineman, and plaintiff's foreman was near the base of the pole and instructed plaintiff concerning what he should do while on the pole.

    6. Plaintiff Morris looked only at one side of the pole before mounting it.

    7. The general standards and practices of the linemen's trade require that

■ Where, as here, the cause has been before the court and has been remanded for further proceedings pertaining to a narrow issue, and the cause is tried in accordance with the mandate, there is little to review following the second trial. The findings are not to be set aside unless found to be clearly erroneous. Hart v. Western Inv. & Dev. Co., 417 F.2d 1296, 1300 (10th Cir. 1969); Glens Falls Ins. Co. v. Newton Lumber & Mfg. Co., 388 F.2d 66, 70 (10th Cir. 1967). And even though there may be a conflict in the evidence, a trial court's opportunity to judge the credibility of the witnesses is respected. United States Fidelity & Guar. Co. v. Oklahoma ex rel. Sebring, 383 F.2d 417, 421 (10th Cir. 1967) and the cases cited there.

■ Virtually the only question which we are at liberty to consider is whether the evidence is sufficient to support the trial court's finding that the standards and practices in the industry required appellant to utilize the prescribed safety precautions before undertaking an action which presented obvious hazards. There was not only adequate but overwhelming evidence in support of the trial court's finding that defendant had failed to take steps to protect himself.

■ The inquiry under New Mexico law is not dissimilar from that generally prevailing, that is, whether the plaintiff's conduct comes up to the standard that a reasonably prudent person would observe in order to avoid injury to himself. See Johnson v. Primm, 74 N.M.

597, 396 P.2d 426, 429 (1964); Williams v. City of Hobbs, 56 N.M. 733, 249 P.2d 765 (1952). This court has previously considered and applied the standards approved by the Supreme Court of New Mexico. See Caraglio v. Frontier Power Co., 192 F.2d 175, 178–179 (10th Cir. 1951), quoting Saindon v. Lucero, 187 F.2d 345, 346 (10th Cir. 1951), cert. denied, 342 U.S. 824, 72 S.Ct. 43, 96 L.Ed. 623 (1951).

The action of the court in concluding that appellant was under a duty to take the steps appropriate to the circumstances for the purpose of protecting himself from harm was correct, and it cannot be said that there was any lack of proximate cause considered from either a legal or factual standpoint. It is true that the initial negligence was that of appellee in failing to communicate its specific knowledge of the danger, but the record is replete with evidence that the plaintiff should have known that the pole was weak and was subject to fall following a change in the stress.

We have fully considered appellant's argument that there was a lack of proximate cause with respect to the alleged contributory negligence. We must reject appellant's request that the judgment be set aside on this theory. The evidence does not support a conclusion that the conduct of Uhl & Lopez was wanton rather than simply negligent so as to render the contributory negligence defense inapplicable, but it even so is much too late on this second appeal to consider such a theory.

The judgment is affirmed.

a lineman, such as plaintiff, not climb a pole where the stress is to be changed until certain detection tests have been performed and/or the pole is braced, even though a trusted journeyman lineman is already on the pole, and the foreman has instructed the second lineman, such as plaintiff, to climb the pole.

8. If such general standards and practices were followed before plaintiff climbed the pole, plaintiff would have discovered that the pole was rotten or the pole would have been sufficiently braced and would not have fallen.

APPENDIX

This diagram is made directly from the testimony of Mr. Shaver, engineer fro Defendant Lopez, who drew a similar diagram on a blackboard for the Trial Judge as he gave his testimony. (Tr. 67-75).

It is presented here merely as an important aid in understanding the situation as it existed with regard to pole 100 prior to the accident. This diagram was not introduced in evidence and we do not attempt to do so at this time.