INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, LOCAL UNION NOS. 12, 111, 113, 969, Unincorporated Associations, Plaintiffs-Appellees,

v.

PROFESSIONAL HOLE DRILLING, INC., a Colorado Corporation, Defendant-Appellant.

No. 76–1594.

United States Court of Appeals, Tenth Circuit.

Argued Sept. 30, 1977.

Decided April 14, 1978.

Rehearing Denied May 25, 1978.

See also 10 Cir., 535 F.2d 1.

Milnor H. Senior of Milnor H. Senior, P. C., Denver, Colo., for plaintiffs-appellees.

Martin D. Buckley of Hornbein, MacDonald & Fattor, Denver, Colo., for defendant-appellant.

Before LEWIS, Chief Judge, SETH, Circuit Judge, and BRIMMER, Chief Judge.*

BRIMMER, District Judge.

Appellant-Defendant, Professional Hole Drilling, Inc. (PHD), seeks review of an adverse judgment in a dispute with the Appellee-Plaintiff, International Brotherhood of Electrical Workers (Union) over the meaning and effect of a collective bargaining agreement.

In March of 1974 PHD became a signatory to a collective bargaining agreement by executing a Letter of Assent thereto. The agreement was initially entered into by the Union and the Western Line Contractors of the National Electrical Contractors Association (N.E.C.A.). Subsequent to signing the Letter of Assent, PHD began work in the construction of a project in the Colorado Springs, Colorado area and PHD complied with the collective bargaining agreement on that project.

On February 9, 1976, PHD obtained a sub-contract from Erickson Air Crane Co. regarding construction work for the Bureau of Reclamation. Because of apparent problems with the bonding of the job, PHD was unable to fulfill the contract. Shortly be-

* Of the District of Wyoming, Sitting by Designation.

fore the cancellation of that contract, PHD entered into a joint-venture agreement with Caissons, Inc. During early March of 1976 the joint venture was able to obtain the same sub-contract from Erickson that had been initially awarded to PHD. This sub-contract also had an effective date of February 9, 1976.

From October of 1975 through March of 1976 PHD and the Union carried on discussions concerning the application of the collective bargaining agreement to the Erickson project. Specifically, PHD wanted the Union to agree to a lower hourly wage as well as waive the travel pay requirements. The parties were unable to agree as to the issues and the Union, pursuant to the contract, submitted the matter to the Joint Conference Committee for arbitration.

At the arbitration hearing, PHD asserted that for the purposes of the Erickson project it was part of a joint venture which was not a signatory to the contract, and that therefore the committee was without jurisdiction. The arbitration committee concluded, that it did have jurisdiction, that the agreement was fully applicable to their project, that PHD was in violation of the agreement, and ordered PHD to fully comply with the contract. When PHD did not comply with the committee's order, the Union commenced this action under Section 301(a) of the Labor Management Relations Act, 29 U.S.C. Section 185(a) (1947), and Section 9 of the United States Arbitration Act, 9 U.S.C. Section 9.

The District Court at trial without a jury upheld the arbitration order, finding that PHD was a party to the line agreement made by the Union and N.E.C.A., found that the dispute was arbitrable and that the committee had jurisdiction over the matter. The Court entered its order requiring specific performance of the arbitration award. On appeal PHD contends that (1) it is not now a signatory to the line agreement; (2) PHD was not obligated to arbitrate this dispute; and (3) the arbitration award is not enforceable.

## I.

PHD asserts that its Letter of Assent to the collective bargaining agreement was executed for only one project and that therefore PHD was not a signatory to the agreement for the purposes of any work other than the initial Colorado Springs project. This assertion was supported by the testimony of Marvin Krumholt, the President of PHD, who testified that the Letter of Assent was to be effective for "one job, one job only." His testimony was contradicted, however, by that of George Waterhouse, a Union official, who stated that at no time did the PHD president request a fixed duration Letter of Assent. The Letter of Assent itself provided that it would remain in effect until terminated by PHD, and Krumholt testified that it had never been terminated.

When a case is tried without a jury this Court will not set aside the findings of a trial court unless the finding is clearly erroneous, even though there may be a conflict of evidence. *Morris v. Uhl & Lopez Engineers, Inc.*, 468 F.2d 58 (10th Cir. 1972). Additionally, where the terms of a contract are unambiguous the parties will be bound by that instrument. *Local 9, International Union of Operating Engineers AFL–CIO v. Siegrist Construction Company*, 458 F.2d 1313 (10th Cir. 1972); *Kohler, Stover & Ivey v. City of Tulsa*, 214 F.2d 946 (10th Cir. 1954). We therefore conclude, since the trial court's finding is not clearly erroneous, that the trial court did not err in finding that PHD was a signatory to the agreement at the time of the dispute in question.

PHD alternatively suggests that the agreement contained an illegally discriminatory job referral system, relying on the recent case of Local Union No. 68, International Brotherhood of Electrical Workers and Billie N. Burt, Jr., an Individual, and Rocky Mountain Chapter, National Electrical Contractors Association, NLRB No. 27–CB–926. The agreement before us expressly provides that applicants for employment shall be selected and referred "without discrimination against such applicant by reason of membership or nonmembership in

the Union and such selection or referral shall not be affected in any way by rules, regulations, bylaws, constitutional provisions or any other obligation of Union membership, policies or requirements." (R., Vol. 3, 64)

■ Discrimination cannot be inferred from the face of an instrument when that instrument specifically provides there will be no discrimination against applicants. There is no evidence in the record before us which establishes any discrimination on the part of the Union. Absent such a showing of discrimination, we cannot find that the agreement was illegal. *Local 357, International Brotherhood of Teamsters v. NLRB*, 365 U.S. 667, 81 S.Ct. 835, 6 L.Ed.2d 11 (1961).

■ In addition, the affirmative defense of illegality is waived if not pleaded. Moreover, it cannot thereafter be raised for the first time on appeal. *Radio Corporation of America v. Radio Station KYFM*, 424 F.2d 14 (10th Cir. 1970). PHD failed to raise the issue of illegality as required by Rule 8, Federal Rules of Civil Procedure, and therefore that defense is not now properly before us. Finally, allegations of illegality which are raised under Section 8 of the Labor Management Relations Act must be initially adjudicated before the National Labor Relations Board. *Oil, Chemical & Atomic Workers International Union v. Arkansas Louisiana Gas Co.*, 332 F.2d 64 (10th Cir. 1964).

For the foregoing reasons we are of the opinion that PHD's assertion of the defense of illegality is without merit.

## II.

PHD next contends that it was not obligated to arbitrate disputes arising over the Erickson project sub-contract, because it was part of a joint venture which was not a signatory to the collective bargaining agreement. The joint conference committee and the court below were, however, of the opinion that PHD was under a duty to arbitrate. We agree.

The district court relied in reaching its decision on the case of *John Wiley & Sons v. Livingston*, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) where an employer had "disappeared" by means of a merger and the Supreme Court, nevertheless, required the new entity to go to arbitration because of the substantial identity between the old company and the merged business. The *Wiley* decision has indeed been limited by a series of successor-employee cases, the most notable of which are *NLRB v. Burns Security Services*, 406 U.S. 272, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), and the more recent decision in *Howard Johnson Company v. Detroit Local Joint Executive Board*, 417 U.S. 249, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974).

In *Howard Johnson*, Grissom Corporation sold in part and leased in part its motor lodge and restaurant to Howard Johnson Company. At the time of the sale Grissom was a signatory to a collective bargaining agreement with the Hotel Employees Union. When Howard Johnson began hiring new employees for the lodge and restaurant, the Union filed an action alleging a lockout and requesting an order compelling arbitration. The Supreme Court refused to compel arbitration and in so doing distinguished the *Wiley* case. The Court enumerated several points of differentiation, the most significant being the continuity of work force before and after the change of business identity. Where the employees were virtually identical after the merger in *Wiley*, there was no such identity in *Howard Johnson*.

While the reasoning in *Wiley* is highly persuasive relative to this case, there does not seem to be the identity of work force which is required in *Howard Johnson* to make *Wiley* the sole controlling authority in the case at bar. Nevertheless, this Court will not reverse the decision of a lower court where there are proper grounds to affirm. *Pound v. Insurance Company of North America*, 439 F.2d 1059 (10th Cir. 1971).

The Court, in *Howard Johnson*, stressed that the facts of each case were to be given substantial weight in a court's decision:

. . . . The Court in *Burns* recognized that, its decision 'turned to a great extent on the precise facts involved here.' The same observation could have been made in *Wiley*, as indeed it could be made in this case. In our development of the Federal common law under Section 301 we must necessarily proceed cautiously, in the traditional case by case approach of the common law. Particularly in light of the difficulty of the successorship question, the myriad of factual circumstances and legal contexts in which it can arise, and the absence of congressional guidance as to its resolution, emphasis on the facts of each case as it arises is especially appropriate. (417 U.S. at 256, 94 S.Ct. at 2240)

 The facts of this case before us are most instructive. According to Mr. Krumholt, who was secretary-treasurer of the joint venture as well as president of PHD, the joint venture was formed in early January of 1976. The written joint venture agreement was executed on January 30, 1976. PHD made no mention of this fact to the Union, but continued to discuss the work on the Erickson sub-contract in the context of performing it under the line agreement. These conferences were held between January 8, and March 19, 1976. Mr. Krumholt and Mr. Schaeffer, who was both vice president of PHD and the joint venture, represented PHD at these meetings. On February 9, 1976, PHD made the initial sub-contract with Erickson. That contract was cancelled because of the problem of bonding the job. Krumholt testified that the joint-venture contract with Erickson was thereafter negotiated in the early part of March, although dated February 9. On March 19, 1977 differences over the contract were still being discussed by the parties without reference to the joint venture. Furthermore, referrals were requested from the Union for the project. For the first time, at the arbitration committee hearing, PHD interposed the joint venture as a bar to arbitration.

The actions of a party to a contract are to be accorded substantial weight in determining its rights and duties under the contract. *Fanderlik-Locke Co. v. United States*, 285 F.2d 939 (10th Cir. 1960), cert. denied, 365 U.S. 860, 81 S.Ct. 826, 5 L.Ed.2d 823. The conduct of PHD in this matter is completely at odds with its assertion that it had no duty to arbitrate. Long after PHD entered into the joint venture and indeed after the joint venture had obtained the Erickson sub-contract, PHD continued to talk with the Union regarding disputes arising under the contract. These discussions were carried on relative to the Erickson project by principal officers of PHD and the existing joint venture. We are of the opinion, based on the record before us, that PHD was obligated to arbitrate, and that its conduct, even while PHD was part of the joint venture, indicated such an expectation.

A significant difference between this case and the successor cases is that the arbitration order herein was made against a signatory to the agreement. In *Wiley, Burns* and *Howard Johnson* the potential order was focused on a successor entity. No such claim has been made against Caissons, Inc. or the joint venture. The *Howard Johnson* case is particularly in point, in that the Supreme Court recognized Grissom's duty to arbitrate after the sale. The Court there stated:

. . . (T)he disappearance of the original employing entity in the Wiley merger meant that unless the Union were afforded some remedy against Wiley, it would have no means to enforce the obligations voluntarily undertaken by the merged corporation . . . . Here, in contrast, because the Grissom corporations continue as viable entities with substantial retained assets, the Union does have a realistic remedy to enforce their contractual obligation. Indeed, the Grissoms have agreed to arbitrate the extent of their liability to the Union and their former employees . . . . (417 U.S. at 257, 258, 94 S.Ct. at 2241)

Similarly, in the case of *Bressette v. International Talc Company*, 527 F.2d 211 (2d Cir. 1975), in which an employee discontinued business and therefore sought to avoid arbitration, the court said:

The Company's argument that the termination of its business in effect terminated its obligations of the collective bargaining agreement, including the agreement to arbitrate disputes, is an argument on an interpretation of the contract which should be directed to the arbitrator. . . What the Company is really contending is not that the agreement has expired, but that the agreement properly interpreted, imposes no obligations on the Company once it has unilaterally determined that it will terminate operations. This is not an issue whether or not there is a contract, but of what the contract requires, and is for the arbitrator. (527 F.2d at 215)

The case at bar is no different. PHD contends that its unilateral decision to enter into the joint venture released it from any obligations under the line agreement. There is no issue as to the existence of a contract, to which PHD was a signatory. The agreement permits eventual arbitration by means of the joint conference committee of "any grievance which may arise between the Union or its members and the Employer with respect to the application of the agreement." Where the Grievance procedure is of such broad scope and where it appears that the principal contention of PHD centers on the actual application of the agreement, arbitration would seem to be the proper procedure to follow.

Because PHD was a signatory to the line agreement and because of the particular factual background of this case, we hold that the Appellant was not discharged of its contractual duty to arbitrate, by reason of its entry into the joint venture.

### III.

The Appellant finally contends that even if it was obligated to arbitrate, the decision of the Joint Conference Committee was improper.

The collective bargaining agreement provided that decisions rendered by the Joint Committee "shall be final and binding." Such decisions are entitled to the same weight, and should be reviewed by the same standard as an arbitrator's award, or the award established by agreement of the parties for settling disputes arising under a collective bargaining agreement. *General Drivers, Warehousemen and Helpers, Local Union No. 89 v. Riss and Company, Inc.*, 372 U.S. 517, 83 S.Ct. 789, 9 L.Ed.2d 918 (1963); *Humphrey v. Moore*, 375 U.S. 335, 84 S.Ct. 363, 11 L.Ed.2d 370 (1964).

The standard of review of arbitration cases is set forth by the Supreme Court in the so-called *Steelworkers Trilogy. United Steelworkers of America v. American Manufacturing Company*, 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior and Gulf Navigation Company*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and *United Steelworkers of America v. Enterprise Wheel and Car Corporation*, 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960), wherein the Court stated:

The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards. (363 U.S. at 596, 80 S.Ct. at 1360)

. . . (T)he question of interpretation of the collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction which is bargained for; and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him because their interpretation of the contract is different from his. (363 U.S. at 599, 80 S.Ct. at 1362)

This court has previously recognized the effect of the *Steelworkers Trilogy* in *Amalgamated Butcher Workmen Local Union No. 641 v. Capitol Packing Company*, 413 F.2d 668 (10th Cir. 1969), where we said:

It is settled law that an award of an arbitrator under an arbitration provision in a collective bargaining agreement, which provides the arbitrator's decision shall be final and binding on the parties, is not open for review on the merits. The merits embrace not only asserted errors

in determining the credibility of witnesses, the weight to be given their testimony, and the determination of factual issues, but also the construction and application of the collective bargaining agreement . . . . (413 F.2d at 672)

Review of arbitration awards is strictly confined to whether the arbitrator interprets and applies the collective bargaining agreement so that his award is rooted in the agreement. So long as the Joint Conference Committee limited itself to interpreting and applying the agreement, we are obliged to give great deference to any award given. *Campo Machining Co., Inc. v. Local Lodge No. 1926 of International Association of Machinists and Aerospace Workers*, 536 F.2d 330 (10th Cir. 1976). Where there is a broad arbitration provision in the contract, as there is in this case, we will not interfere with an arbitrator's decision unless it can be said with positive assurance that the contract is not susceptible of the arbitrator's interpretation. *Local 1912, International Association of Machinists v. United States Potash Company*, 270 F.2d 496 (10th Cir. 1959). Here the decision of the committee was clearly restricted to deciding the dispute submitted by the union. It would be difficult to find a better example of an arbitrable dispute than the one now before us, for the Union's allegations deal specifically with wage rates, benefits required under the agreement, and the use of the job referral system established under the contract.

PHD would, however, contend that the award of the Committee was unenforceable because it improperly affected the rights of the joint venture. PHD asserts that there has been a violation of procedural due process since neither the joint venture nor Caissons, Inc. were present at the Joint Conference Committee Hearing. As noted previously, both the Joint Conference Committee and the District Court have restricted their decisions to PHD. It is our opinion that the due process allegation is therefore without merit.

Admittedly, the award against PHD may have an indirect effect on the joint venture. However, any such tangential effect does not require interference with the arbitrator's award.

The same facts which compelled the lower court to find that PHD had a duty to arbitrate were before the Joint Conference Committee at the arbitration hearing. It was apparent there that PHD had carried on negotiations with the Union concerning disputes relative to the Erickson contract. It is also a fact that PHD was part of the joint venture at the time of these discussions. Finally, it is now undisputed that the representatives of PHD were also officers of the joint venture.

In the *United Steelworkers of America v. Warrior and Gulf Navigation Company*, 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960), the Court stated:

In a suit under Section 301(a) judicial inquiry must be strictly confined to the question whether the reluctant party did agree to arbitrate the grievance or did agree to give the arbitrator the power to make the award he made. An order to arbitrate should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage. (363 U.S. at 582–583, 80 S.Ct. at 1353)

We conclude that PHD by contractual obligation as well as its subsequent conduct agreed to arbitrate and also agreed to be bound by the decisions of the Joint Conference Committee. In sum, this Court simply cannot say with "positive assurance" that the collective bargaining agreement was not susceptible of the interpretation given it by the arbitrator. Therefore it is our opinion that the decision of the arbitrator is not open to review on the merits, and the judgment of the District Court is accordingly affirmed.