**RIO RANCHO ESTATES, INC. and Amrep Construction Corporation at Rio Rancho, Plaintiffs-Appellees,**

v.

**Gary T. BEYERLEIN and Robert Holmes, d/b/a Superior Builders, Defendants-Appellants.**

No. 80–1357.

United States Court of Appeals, Tenth Circuit.

Argued and Submitted July 13, 1981.

Decided Nov. 3, 1981.

Jerrald J. Roehl and Ronald W. Henkel, of Jerrald J. Roehl & Associates, Albuquerque, N. M., for plaintiffs-appellees.

Herbert A. Delap, of Shafroth & Toll, Denver, Colo., for defendants-appellants.

Before BARRETT and LOGAN, Circuit Judges, and CHILSON *, District Judge.

CHILSON, District Judge.

This action was commenced in the District Court for the County of Sandoval, New Mexico, on July 12, 1978, and was thereafter removed to this court on the ground of diversity of citizenship.

Plaintiff, Rio Rancho Estates, Inc., (Rio Rancho) was the owner and developer of a large tract of land located in Sandoval County, New Mexico. Plaintiff, Amrep Construction Corporation, (Amrep) was the general contractor for the construction of houses on the Rio Rancho land. Amrep subcontracted certain portions of the con-

---

* Of the United States District Court for the District of Colorado, sitting by designation.

struction to the defendants, Beyerlein and Holmes, d/b/a Superior Builders (Superior) beginning in the summer of 1977. Between July 1977 and January 1978, Amrep and Superior entered into a number of subcontracts which were completed by Superior and accepted by plaintiffs.

In February 1978, Amrep entered into four additional subcontracts, one for framing, one for concrete, one for plumbing, and one for painting of houses to be constructed in the Star Heights addition of the Rio Rancho development. It is the 1978 contracts which give rise to this litigation.

In May 1978, Amrep, because of alleged poor quality of the work of the defendants under the 1978 framing contract, terminated the framing contract. The defendants then refused to continue the work under the other three contracts (concrete, plumbing, and painting) and filed 163 liens on various houses in the Star Heights Addition.

Thereupon, plaintiffs instituted this action to cancel the liens and for compensatory and punitive damages for the defendants' breach of these contracts.

Defendants counterclaimed for foreclosure of the liens and for compensatory and punitive damages.

After trial, the trial court made findings of fact and concluded that the plaintiffs were entitled to recover from defendants the sum of $102,936.72, and entered judgment in favor of the plaintiffs and against the defendants in that amount. The claims of both parties for punitive damages was denied.

Defendants appealed.

Defendants allege four grounds for reversal and remand for a new trial.

1. The trial court committed error by not making a factual determination as to the standard of acceptable work established by the course of dealings between the parties.

2. Plaintiffs' acceptance of defendants' work product is a bar to damages and -renders plaintiffs' termination wrongful.

3. It was error to limit defendants' recovery for the reasonable value of labor and materials only to the amount actually claimed in their lien.

4. Plaintiffs did not follow the contractual provision which were a condition precedent to the recovery of back charges against the defendants.

The defendants' contentions should be considered in the light of the trial court's findings of fact and the rule of law which requires that the trial court's findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. Rule 52(a), Federal Rules of Civil Procedure; *Raulie v. United States*, 400 F.2d 487 (10th Cir. 1968) and *Rudd Paint and Varnish Co. v. White*, 403 F.2d 289 (10th Cir. 1968).

The pertinent part of the court's findings of fact are as follows:

It appears from the evidence that the Defendants were performing work for Plaintiffs as early as July 1, 1977. And from the period from July 1, 1977 to July 1, 1978, questions arose as to Defendants' ability to satisfactorily perform the contract projects assigned to them by Plaintiffs. It further appears that Defendants' workmanship substantially declined after January 1978.

The construction manager for Amrep inspected the construction project daily. He found that the framing was unacceptable. The walls were not plumbed, spaces remained around the doors, houses were out of level, and plates on the frames were not nailed. When money was held back by Plaintiffs because of these deficiencies, Defendants agreed to institute quality control, but this did not last too long.

The State Building Inspector, Herbert McClure, on inspection, found that the quality of Defendants' work was very poor. He also found framing and roof decks to be inferior. He cited constant trouble with the plumbing work. Finally, he red-tagged one house as representa-

tive of 80 houses with similar problems. These problems were not limited to crooked studs, unsquare corners, walls not plumbed, improperly installed headers and improper and faulty installation of plywood. He found shingles irregularly angled and improperly nailed. He met with Plaintiffs' representatives and ordered them to correct the same. Plaintiffs thereupon demanded corrective action of Defendants, but Defendants failed to respond. It was McClure's opinion, which is accepted by the Court, that Defendants' work did not meet the standard required of the industry in the community. McClure's opinion is supported by witness Bassett, a state building inspector, who also found Superior's work to be substandard.

A main complaint was the inadequacy of the headers installed by Superior. It is clear from the evidence that the Uniform Building Code does not specifically address the manner of installation of headers; that the standards for the installation of headers is left to the discretion of the inspecting official. Accordingly, the Court finds that the standards imposed by inspector McClure were not unreasonable.

It appears from the evidence that Defendants did not meet acceptable building standards as early as January, 1978. The job finally was shut down by Mr. McClure in April 1978, after his giving Defendants ample time to correct cited deficiencies. When Defendants were unable or unwilling to correct the deficiencies, Plaintiffs terminated the framing contract.

Defendants' own witness, Stan Adams, previously employed by Plaintiff, supported Plaintiffs' claim of poor workmanship. Adams cited lack of supervision by Superior as the cause of 'very bad construction.' This is further borne out by evidence that Holmes was responsible for the day-to-day operation; and that he spent only about 20–50% of his time in New Mexico. And it also was Adams' testimony that the contract was terminated because of Defendants' inability to perform because of lack of manpower.

Adams stated that he terminated the contract with Defendants because their work was not getting any better and that Plaintiffs could not put up with the poor workmanship of Defendants.

After Plaintiffs terminated the framing contract on approximately May 22, 1978, Superior abandoned the job site. Defendant Holmes justifies the abandonment on the basis that the remaining contracts would prove unprofitable without the framing contract.

## DEFENDANTS' FIRST CONTENTION

■ Defendants contend the trial court committed error in failing to make a factual determination of the standard of acceptable work established by the course of dealings of the parties, including the quality of the work accepted by plaintiffs under the 1977 contracts.

In its findings, the trial court reviewed the course of the dealings of the parties which consisted of a number of subcontracts entered into in 1977 and the last series of subcontracts entered into in 1978.

In the 1977 and 1978 contracts, defendants warranted "that all work under the subcontract shall be of good quality." The 1977 contracts were completed, paid for, and plaintiffs make no claim in this action that the work performed under the 1977 contracts was not of good quality.

Neither the pleadings nor the pre-trial order discloses that any party claimed that the work performed under the 1977 contracts was not of good quality nor do the defendants cite any evidence raising such an issue during the course of the trial.

We conclude that upon the record before it, the trial court's findings were sufficient.

## SECOND CONTENTION

■ Defendants' second contention is that the plaintiffs accepted defendants work under both the 1977 and 1978 contracts and by such acceptance are barred from recovery of damages for the poor quality and defective workmanship found by the trial court.

As a basis for this contention, defendants state in their brief:

> The clear weight of the evidence showed that in one of the trades, framing, Superior's performance was poor throughout the entire period prior to termination. Amrep continued to pay for all of Superior's work in all trades. This continued for ten months. Amrep's acceptance of this performance operated as a promise, by Amrep, to pay for all work done by Superior.

Contrary to the foregoing statement, the evidence is overwhelming that Amrep did not accept and did not pay for all of the work that was performed under the 1978 contracts.

The trial court found that defendants' workmanship substantially declined after 1978 and in its findings specifically pointed out the work which was defective.

Amrep refused to accept and pay for the defective work and demanded that the defendants correct it. Amrep's refusal to accept and pay for the defective work led to defendants' filing liens on plaintiffs' property and this litigation.

The trial court was not in error in awarding plaintiffs damages arising from the defendants' failure to correct the defective work under the 1978 contracts.

## THIRD CONTENTION

### REFUSAL OF COURT TO CONSIDER NON–LIENED CLAIMS

The trial of this action was had in February 1980.

On January 4, 1979, a pre-trial conference was held before a United States Magistrate, Robert W. McCoy.

Thereafter, on June 25, 1979, the parties filed with the court a pre-trial order to govern the trial of the action.

The pre-trial order states the defendants' contentions and with respect to the counterclaims states:

> In the first counterclaim, defendants contend that as a result of the contracts set forth in the complaint, and other agreements attached to the counterclaims, plaintiffs employed Superior Builders to perform certain work to supply labor and materials for the construction of dwellings being constructed by the plaintiffs, for which plaintiffs agreed to pay a reasonable amount. It is further alleged that plaintiffs failed to pay that amount resulting in liens being filed by defendant which should be foreclosed against the security. * * * In the second counterclaim, defendants alleged that plaintiffs employed defendants under certain contracts attached to the pleadings to perform certain work, and that the plaintiffs failed and refused to perform their obligations under the contracts and agreements and thereby prevented the defendants from compliance. * * *

The amount of the liens filed by defendants was $185,709.32.

At the trial, defendants offered evidence in support of a claim for an additional $80,479.72 due defendants under the contracts, but for which no liens had been filed.

Plaintiffs' counsel, Mr. Lastrapes, objected, stating:

> At the time that we did depositions and had discovery on this matter, we were informed that the liens constituted the entire bills or invoices that they would be claiming. It wasn't until this weekend that they discovered another eighty thousand dollars of bills where liens had not been filed that they are claiming here today.
>
> We weren't informed of this fact until the day before trial and based on this information and Mr. Shaw's agreed to stipulate to those.

Defendants' counsel responded:

> MR. SHAW: At the time of the depositions of Mr. Holmes and Mr. Beyerlein which was a year or so ago and that was what was brought out, and that's what we were aware of. We can also point out that there's been discovery throughout.
>
> Mr. Lastrapes went to Phoenix and looked at our records. This weekend,

however, is when we have gotten crates of records from Phoenix and the attorneys had the opportunity to commence the analysis, that's correct.

MR. LASTRAPE: And we were never informed that their position was any different, and in fact, they didn't know until this weekend, and we didn't know it until the day before trial, and based on this, we would move that any evidence being introduced as to those claims be stricken and that that not be considered, Your Honor.

THE COURT: You know, you gentlemen were limited by that pretrial order. That's what a pretrial order is for. Now, I am not so sure that you can't always amend to conform to the evidence, but I will take that up at the time you have your final arguments and you can submit law.

(Transcript, Volume III, pages 443 and 444)

The Court in its decision filed February 26, 1980, held:

Although the claim of Defendants on their counterclaim originally was based upon the amount of the liens in the sum of $185,709.32, Defendants sought to amend the amount of their claim to the amount, after credits, of $266,189.04. It appears that Defendants were unaware of the sum in excess of $185,709.32 until approximately 3 days before the trial of the case. At all times prior thereto, Defendants led Plaintiffs to believe that the amount of Defendants' claim was limited to the amount of the liens. The Court concludes that this amendment is unfair to Plaintiffs, that it comes too late, and that because of their inaction in properly formulating the amount of their alleged claim, Superior will be restricted to the initial claim of $185,709.32, the amount of defendants' liens.

Rule 15(b) of the Rules of Civil Procedure provides, in pertinent part:

If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby, and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits.

In applying this rule in *Monod v. Futura, Inc.*, 415 F.2d 1170 at 1174 (10th Cir. 1969), this Court stated:

"... Allowance of amendments is discretionary but should be allowed if the opposing party 'fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his * * * defense upon the merits.' "

The facts support the trial court's finding that the admission of the evidence in question would prejudice the plaintiffs.

■ We conclude that the trial court did not abuse its discretion in denying defendants' request to amend the amount of their claim and in restricting defendants to their initial claim of $185,709.32.

The trial court did not err in so ruling.

### FOURTH CONTENTION

*Failure to Comply with Notice Provisions in Contract*

■ The trial court awarded to plaintiffs, $24,752.39 for "back charges". The back charges are the amounts paid others to repair work performed by Superior that did not meet the standard of good quality. Defendants, on appeal, do not dispute that the amount of the back charges was paid by the plaintiffs for that purpose.

Defendants contend that the plaintiffs in contracting for the corrective and repair work did not comply with paragraph 11.10 of the subcontract which provides:

The Contractor, after three working days' written notice to the subcontractor, may, without prejudice to any other remedy he may have, make good such deficiencies and may deduct the cost therefrom the payments then or thereafter due the subcontractor, provided, however, that if such action is based upon faulty workmanship or materials and equipment, the Architect shall first have determined that the workmanship for materials and

equipment are not in accordance with the Contract Documents. [emphasis added] see Plaintiff's Exhibit 22, a copy of which is attached hereto as appendix 4.

The trial court found that prior to the termination of the framing contract on May 22, 1978, Amrep and the state building inspector had called the deficiencies to the defendants' attention and demanded that the defendants correct the deficiencies, but defendants "failed to respond".

The trial court further found: "The job finally was shut down by Mr. McClure (state building inspector) in April 1978, after his giving defendants ample time to correct cited deficiencies." When defendants were unable or unwilling to correct the deficiencies, Amrep terminated the framing contract on May 22, 1978.

From the findings of the trial court, the defendants had actual notice of the deficiencies and ample time within which to correct them before the framing contract was terminated.

We conclude that the trial court did not err in awarding plaintiff back charges of $24,752.39.

The judgment of the trial court is affirmed.