John L. MARINO, d/b/a Wishbone Oil & Gas, Plaintiff–Appellant, Cross–Appellee

v.

OTIS ENGINEERING CORPORATION, Defendant–Appellee, Cross–Appellant.

Nos. 85–1800, 85–1957.

United States Court of Appeals, Tenth Circuit.

Feb. 23, 1988.

Robert D. Edinger (William R. Burkett and James W. Morris, III, with him on the briefs), of Linn & Helms, Oklahoma City, Okl., for plaintiff-appellant, cross-appellee.

Rodney J. Heggy of Cheek, Cheek & Cheek, Oklahoma City, Okl., for defendant-appellee, cross-appellant.

Before ANDERSON, TACHA and TIMBERS *, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

John L. Marino d/b/a Wishbone Oil and Gas ("Marino") sued Otis Engineering Corp. ("Otis") in federal court, based on diversity of citizenship, alleging negligence in the manufacture and installation of a device known as a packer, which is installed in oil and gas wells to assist in the extraction of oil and gas. Marino sought damages of $1,985,146.00 resulting from the alleged failure of a packer installed by Otis in one of Marino's wells. Oklahoma law governs.

Following a jury verdict in favor of Otis, Marino's motion for a new trial was denied. Marino appeals that denial, essentially relying on two arguments: First, that the trial court erred by admitting evidence of contributory negligence by Marino when Otis had not pleaded that defense, and the district court had previously granted a motion

* Hon. William H. Timbers, Sr. Judge, U.S. Court of Appeals, Second Circuit, sitting by designation.

in limine prohibiting evidence on a contributory negligence defense. Second, Marino asserts that the court erred when, after an initial ruling allegedly restricting such testimony, the court permitted one of Otis's expert witnesses to testify about tests performed after his deposition and about which, therefore, Marino allegedly had no knowledge until the eve of trial, making effective trial preparation, and preparation of rebuttal evidence, impossible. Marino asserts it was surprised and prejudiced by this testimony, that the combined effect of these errors unfairly changed the course of the trial, affecting the outcome, and constituted "trial by ambush."

Otis cross-appeals. It contends that the district court erred in not awarding attorneys fees to Otis, as the prevailing party, pursuant to Okla. Stat. tit. 12 § 940(A). It also seeks attorneys fees for its efforts on appeal.

Before a trial court's decision to deny a motion for a new trial will be reversed, it must have committed a clear abuse of discretion. *See Ryder v. City of Topeka,* 814 F.2d 1412, 1424 (10th Cir.1987); *United States v. Latimer,* 780 F.2d 868, 870 (10th Cir.1985). Because we find no such abuse here, we affirm the district court with the sole exception of its ruling denying attorneys fees to Otis. As to that issue, we are persuaded that the applicable Oklahoma statute requires an award in this case.

## I.

The controversy in this case concerns an Otis manufactured and installed packer which became stuck in Marino's well located in Oklahoma. Because it became stuck, Marino had to mill it out. He claims that this operation destroyed the productivity of the well. Marino alleged that Otis was negligent in two respects, first, in install-ing the packer in the well with too many shear pins in it, so as to make it irretrievable, and second, in failing to clean sand from the top part of the packer assembly known as the tubing seal divider mandrel. Marino alleged that this sand caused the overshot tool, when it was sent to free the packer, to become stuck to the packer, making the whole assembly irretrievable.[1]

On the other hand, Otis introduced evidence at trial showing that Marino modified the overshot tool by cutting triangular notches in the skirt of the overshot. Otis suggested as one of its theories of defense that these notches were responsible for the binding of the packer to the overshot.

■ Nonetheless, in its answer to Marino's complaint which commenced this suit, Otis failed to assert any affirmative defenses. Although in discovery Otis stated that it would amend its answer to assert the defense of contributory negligence in the notching of the overshot component of the packer assembly, it failed to do so. Nor did either party prepare a pretrial order outlining the witnesses to be called and the issues to be tried.[2] Thus, Otis did not assert any affirmative defenses by way of pretrial order. Accordingly, at the commencement of trial, Marino made a motion in limine to prevent Otis from introducing any evidence related to Marino's contributory negligence, since contributory negligence must be pleaded according to Fed.R. Civ.P. 8(c).[3]

■ In granting the motion the court noted:

"I think it's a good motion in that the defendant has alleged or pled no affirmative defense whatever, just a general denial. So we'll just have to wait and see if any evidence is tendered on behalf of the

---

1. Although a considerable amount of evidence was adduced on a number of issues at trial, most of the evidence involved in this appeal concerns why the overshot tool sent to free the packer assembly became stuck to the packer's tubing seal divider.

2. Otis did prepare and submit a pretrial order after trial had begun, but it was not accepted by the trial court.

3. What is styled in this action as contributory negligence is more commonly known elsewhere as comparative negligence. *See* Okla. Stat. Ann. tit. 23 §§ 13–14 (West 1987). This, however, does not alter Otis's obligation to plead such negligence as an affirmative defense. *See A.D. E. Inc. v. Louis Joliet Bank and Trust Co.,* 742 F.2d 395, 397 (7th Cir.1984); Fed.R.Civ.P. 8(c).

defendant or attempted to [be] tendered by way of an affirmative defense. I'm not going to allow it because you didn't plead any. The burden is still on the plaintiff to prove his case."

R.Vol. VI at 119–20.

At trial, the court refused to permit Otis to enter into evidence Defendant's Exhibit Number Seven because it related to the modification by Marino of the overshot portion of the packer assembly. The court also refused to allow Otis's counsel to ask Marino's chief man at the rig, Bill Hicks, about his modifications to the overshot. R.Vol. VI at 142–50.

During later testimony, however, Otis introduced photographs taken by one of Marino's witnesses which showed the modification to the overshot. Over Marino's objections the exhibits were admitted by the court because since the pictures were taken by Marino's witness the court found "there could be no surprise." [4] Again, Marino objected when Otis introduced Defendant's Exhibits 61 and 62 which were also photographs of the overshot. The judge nonetheless admitted the exhibits for a limited purpose noting:

"The jury will be told again that the defendant herein has raised no defense. They have not pled any affirmative defense but they deny the plaintiff's claim, so they are entitled to try and disprove anything that the plaintiff has attempted to establish; and if it does tend to rebut or disprove any of the evidence that the plaintiff has offered, it will be received for that purpose; for no other."

R.Vol. VI at 259.

Later in the trial, Otis attempted to amend its answer and provide the court with a pretrial order, so that it could raise the notching issue as contributory negligence. In denying this request the court stated:

"Now, I'm not going to allow the evidence on the notching for any purpose other than it may tend to disprove your claim that the negligence of the defend-

ant proximally (sic) caused the whole thing; and as far as I'm concerned, you can get in almost as much evidence, the defendant can, as he could otherwise, except you're not going to be given any instructions on any affirmative defenses because you didn't plead any; but any evidence that might tend to show that it was not the defendant's negligence that caused this, is going to be received in evidence."

R.Vol. VI at 395–96. After this clarification both sides referred to the notching of the overshot throughout the remainder of the trial.

The court's decision to permit evidence of Marino's modification to the overshot for purposes of disproving causation only, supports Marino's contention that the broad sweep of the ruling on the motion in limine was altered during trial. However, the court's decision to admit the contested evidence was not error unless the admission constituted a clear abuse of discretion. *See Robinson v. Audi NSU Auto Union Aktiengesellschaft*, 739 F.2d 1481, 1483 (10th Cir.1984); *May v. Interstate Moving & Storage Co.*, 739 F.2d 521, 524 (10th Cir. 1984). "A ruling on the threshold of trial does not preclude the court changing its ruling based on other developments during trial." *Thweatt v. Ontko*, 814 F.2d 1466, 1470 (10th Cir.1987) (quoting *Zehner v. Post Oak Oil Co.*, 640 P.2d 991, 995 (Okla. Ct.App.1981)).

Marino argues that the court did abuse its discretion because according to Fed.R. Civ.P. 8(c) Otis's failure to plead Marino's negligence as an affirmative defense waives that defense and bars evidence on the point as a matter of law. *Radio Corp. of Am. v. Radio Station KYFM, Inc.*, 424 F.2d 14, 17 (10th Cir.1970); *see also Int'l Bhd. of Elec. Workers Locals 12, 111, 113 & 969 v. Professional Hole Drilling, Inc.*, 574 F.2d 497, 500 (10th Cir.1978); *State Farm Mut. Auto Ins. Co. v. Mid–Continent Cas. Co.*, 518 F.2d 292, 296 (10th Cir.1975); C. Wright & A. Miller, *Federal*

---

**4.** The specific photographs objected to were Plaintiffs' Exhibits, 90, 100, 98, 97, 83, 82, 81, 94 and 91. R.Vol. VI at 207.

*Practice and Procedure: Civil* § 1278 (1969). However, a distinction may be drawn—and was drawn by the court below —between the introduction of evidence in support of an affirmative defense and the introduction of the same evidence to refute the plaintiff's allegations of causation raised in the complaint and denied in the answer. Here, the court refused to permit the evidence in question to be considered for any purpose other than the refutation of the plaintiff's prima facie case. It refused to give an instruction to the jury regarding contributory negligence, thus guaranteeing that the evidence would not be used other than to disprove the plaintiff's case. *See Radio Corp.*, 424 F.2d at 17. Thus, to the extent that Marino's notching of the overshot is relevant to the question of causation, the evidence of notching in the context accepted by the district court "merely negates an element of the plaintiff's prima facie case ... it is not truly an affirmative defense and need not be pleaded despite rule 8(c)." *Masuen v. E.L. Lien & Sons, Inc.*, 714 F.2d 55, 57 (8th Cir.1983) (quoting *Sanden v. Mayo Clinic*, 495 F.2d 221, 224 (8th Cir.1974)).

In short, the court's modifications to its ruling on the motion in limine appear to represent its best effort to accommodate the preclusive effect of Fed.R.Civ.P. 8(c) with Otis's right to show that its actions were not the cause of Marino's harm. An examination of the circumstances in this case discloses that there was no abuse of discretion in that accommodation.

Even if the evidence had been considered for purposes of establishing contributory negligence, the court did not abuse its discretion in admitting such testimony. The purpose behind rule 8(c), that of putting "plaintiff on notice well in advance of trial that defendant intends to present a defense in the nature of an avoidance," *State Distribs., Inc., v. Glenmore Distilleries Co.*, 738 F.2d 405, 410 (10th Cir.1984) (*citing Hardin v. Manitowoc–Forsythe Corp.*, 691 F.2d 449, 458 (10th Cir.1982)), has been served in this case. Marino was advised at least three months prior to trial by Otis that it intended to raise the notching issue as an affirmative defense. *See* Deposition of Charles Roper, R.Vol. III at 594. And, the notching issue was repeatedly raised in the depositions before trial in some detail. *See* Deposition of William Hicks, *Id.* at 511–16; Deposition of John Harcourt, *Id.* at 521–28; Deposition of W.E. Goad, *Id.* at 671–73; Deposition of John L. Marino, *id.* at 687; Deposition of Alton Rex Jasper, Jr., *Id.* at 728–32. Thus, it would have been within the court's discretion, had it chosen to do so, to deny Marino's motion in limine and permit the amendment of Otis's answer allowing the notching to be considered not only to defeat causation but to affirmatively assert contributory negligence. "Allowance of amendments is discretionary but should be allowed if the opposing party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his ... [case] upon the merits." *Rio Rancho Estates, Inc. v. Beyerlein*, 662 F.2d 700, 705 (10th Cir.1981) (quoting *Monod v. Futura, Inc.*, 415 F.2d 1170, 1174 (10th Cir.1969)).

The trial court, nonetheless, granted Marino's motion and refused to permit evidence for purposes of establishing contributory negligence or to give an instruction thereon. Because Marino would not have been prejudiced had the court denied his motion entirely, he cannot claim prejudice when the trial court excluded the issue of contributory negligence. "Neither side should, consistent with the spirit of the rules, be allowed to sit back and fail to take obvious action to ascertain facts. To fail to do so suggests an attempt to use the rules for the object of developing an error." *Smith v. Ford Motor Co.*, 626 F.2d 784, 804 (10th Cir.1980) (Doyle, J., dissenting), *cert. denied*, 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981). Thus, in this case, there was no trial by ambush, and Fed.R. Civ.P. 8(c) merely gives Marino a hook on which to hang his appeal, albeit unsuccessfully.

## II.

Marino also moved at trial to prohibit expert testimony which Marino anticipated from John Harcourt, one of Otis's expert witnesses. Harcourt had completed tests

between his deposition and trial to determine specifically the effect which Marino's notching of the overshot had on the flow pattern of water pumped down the well to clean debris off the packer. Otis failed to provide Marino with the results of this testing until the night before trial began. Marino requested that any results of such testing be excluded from trial. The court granted this request during Harcourt's trial testimony.[5]

Marino now claims that the court allowed Harcourt to testify impermissibly in at least two respects. First Marino complains that the trial court allowed Harcourt to testify about the results of testing which he completed between deposition and trial, and, second, Marino alleges that Harcourt, to Marino's prejudice, was allowed to testify about theories which Harcourt did not reveal in his deposition or other discovery.

■ The first part of Harcourt's trial testimony, about which Marino now complains, was that the dirt that was present inside the packer assembly when it was pried apart indicated that the modified overshot had not succeeded in completely washing clean the tubing seal divider mandrel. Marino claims that this testimony was the result of the further testing undertaken by Otis between deposition and trial and was thus excluded by the court's order. We cannot agree.

At his deposition, Harcourt testified that the notches would have affected the circulation of the water sent down the hole to clean the top of the packer assembly. However, he was unable to give any specific approximation of the venturi effect which he indicated that the notches would create in the flow pattern. It was to obtain such an approximation that Harcourt conducted the testing between deposition and trial. But in none of the testimony which Harcourt presented at trial was such evidence presented. It is true that Harcourt testified at trial that "the modified tool did not adequately wash the sand out of the J-grooves so that when the overshot was placed over it and latched on, the sand became an ... impediment to the full engagement of the lugs into the J-slot," R. Vol. VIII at 43, but Harcourt had offered similar testimony at his deposition,[6] and he

---

5. The judge defined the scope of the excluded testimony by ruling that "no evidence will be allowed pertaining to any tests that were made subsequent to the date of the deposition of this witness." R.Vol. VIII at 37. At trial, Mr. Harcourt testified that the packer became stuck in the well and the overshot mechanism became stuck to the tubing seal divider because of three conditions caused by the modification to the overshot. Marino objected at this time saying that such testimony was prohibited by the motion in limine. The witness however, assured the judge that his testimony did not concern tests done between deposition and trial. The judge then permitted the testimony but again clarified the scope of the limitation on Harcourt's testimony:

THE COURT: All right.... I'll take your word for it. In other words, the ruling of the Court is intended to allow all the evidence that was known at the time that deposition was taken. I made that clear. Everybody understands that, and you were here and understood it.

THE WITNESS: Yes, sir.

THE COURT: So you go ahead.

THE WITNESS: Yes, sir.

THE COURT: The Court intended to and does exclude any testimony surrounding tests or studies or whatever made since your deposition was taken because it was not furnished to the other side.

THE WITNESS: Yes, sir.

THE COURT: All right. Within those parameters, you go right ahead. Go ahead counsel.

R.Vol. VIII at 41–42.

6. Q. And what is your understanding of the history of the problem in this well, if you have one, based upon these communications?

. . . . .

A. Well, first, I guess, let me kind of start from the beginning and then wrap it around to the beginning—Start with the end.

The end is after the components are removed *from the well where the milling has taken place* over the overshot, gone down, these particular tools are cut off from the packer and retrieved from the hole, removed from the hole, and that section longitudinally cut and opened up where *we see stuck overshot into this tubing seal assembly* and from that, I have information that there was a considerable amount of sand and what have you in the mechanism that would certainly have prevented a proper latch up—unlatching of the tool.

... [T]here may have been no circulation at the time that the overshot was set down on the tubing seal assembly, simply because the frac balls had plugged the—in the Chiksan.... so we certainly have the possibility that as we latched on, we did not have the material circulating

did not mention in his trial testimony any testing which he may have done between his deposition and trial to confirm his opinion. Therefore, such testimony was not prohibited by the court's previous order.

■ The second part of Harcourt's trial testimony about which Marino complains, concerns the various theories which Harcourt offered to indicate how the notches or other causes might further have caused the packer to become stuck. For example, Harcourt testified that the notches might have caused the packer assembly to bind up because the notching of the overshot skirt made a space between the overshot and the well casing capable of catching frac balls and other well debris and causing the sections of the overshot in between the notches to deflect in upon the tubing seal divider mandrel as the overshot was forced down on top of it; he also testified that the notches themselves might catch debris causing the overshot to become inappropriately wedged on top of the mandrel, and frustrating the release of the packer. Finally, he testified that the string shot explosions used by Marino in attempting to jar the packer loose, distorted the packer's shape causing it to become irremovable. Marino argues that this testimony was a prejudicial expansion of Harcourt's deposi-

tion testimony in that it incorporated theories of how the notches caused the overshot to stick to the mandrel which were not revealed at deposition or other discovery. Again, we disagree.

The relatively brief extracts of Harcourt's deposition which are in the record do not support Marino's contention. By studying the thirteen pages of Harcourt's deposition which appear as exhibits to various motions in the record, we can gather that Harcourt indicated in his deposition a number of causes explaining the binding up of the overshot to the tubing seal divider. Because the record does not contain a complete copy of Harcourt's deposition, we cannot tell whether Harcourt believed whether these causes were independent or interrelated. Nonetheless they include: (1) the presence of sand already in the overshot when it connected with the J-slot; (2) sand falling on top of the packer assembly from the well formation; (3) the possibility of this notching causing a change in the turbulation of the water sent to clean the overshot leaving sand on top of the assembly; (4) the possibility that a frac ball or other well debris caught in the notches of the overshot could then be redeposited on top of the J-slot only to be caught in the attempted latch up;[7] (5) the possibility that

sufficient such that we would not have interference when we sat down on the tool, and I believe as the evidence is, full of sand, that was very near the case, that we probably broke circulation right before set down on the tool.

Something that complicated that is the notching of the bottom of the overshot where the—maybe the proper turbulent flow that circulates in picking up frac balls, sand and debris just could not be accomplished with the—with the degree of cleanliness that must take place. Basically the notches created a three point, a venturi affect, so that we did not create the proper turbulence to be clean, if we were real close to the tubing divider.

And there, I think—therein, I think lies the problem.

R.Vol. III at 595–96. Harcourt further testified at deposition that:

Q. Well now, you say if you circulated long enough you might be able to get the sand?

A. It might come clean and on the other hand,—I'm saying I don't know the answer. On the other hand, you might get some backstreaming so that the sand would pull up higher than it would—than you would think. Instead of finally sweeping it clean, it may just create a

pile there, kind of a false feeling. You thought, "Well, I've circulated long enough, now." but because its created this backstream, here, you set down on it, you would move right into a nice pile of sand.

Q. Well, in that case, what you're saying is you'll be getting for instance, some clean flow returns at the top and what you're saying is that may not indicate that you're really clean, then?

A. That's right.

R.Vol III at 523–24.

7. Q. Now, do you have any other opinions aside from the sand inside the overshot and then you have also indicated sand falling on top of the tool is a problem and you have also indicated the possibility of this notching causing a change in the turbulation, turbulent flow of circulation down by the tool is a problem.

Are there any other areas—areas that are problem areas that you have discovered that may have caused this overshot to become stuck to the tubing seal divider?

A. The other area is the possibility that large objects whether it be a frac ball or pieces of steel or whatever material it could be in the

the string shots used by Marino in attempting to jar the packer loose swelled the tubing making the packer irremovable,[8] and finally, (6) the suggestion that well debris would pack in against the overshot making it fit "tighter and tighter." [9] It is not clear to us that these very possibilities, or other aspects of them, are not the causes that Harcourt detailed in his courtroom testimony. And because we have only been given occasional and non-consecutive excerpts from Harcourt's deposition, we cannot say that they are not.

The possible discrepancies which exist between Harcourt's deposition, as provided, and his trial testimony are not of such a scope that we can say that the judge prejudicially affected Marino's substantial rights in admitting Harcourt's testimony. *See Motive Parts Warehouse v. Facet Enterprises*, 774 F.2d 380, 396 (10th Cir.1985); *K–B Trucking Co. v. Riss Int'l Corp.*, 763 F.2d 1148, 1155–56 (10th Cir.1985). As the

trial court instructed counsel, the possible discrepancies, at least in this case, go to the weight which should have been afforded Harcourt's testimony, not to its admissibility.[10] And on several occasions Marino used what he presumed to be such discrepancies in impeaching Harcourt on cross-examination.[11]

■ In any case, Marino never objected to the admission of any evidence on the basis of surprise, nor did he ask for a continuance. Our cases show that when a party requests a new trial on the basis of surprise testimony it must be able to show surprise, prejudice, and an attempt to cure the prejudice such as a motion for a continuance. Assuming *arguendo*, that Marino has shown surprise and prejudice,[12] he did not move for a continuance or take other steps "to cure the alleged prejudice." [13] Such a failure results in the waiver of surprise as a basis for appeal in these

---

debris of the fracing or whatever, could be caught in those [notches] and redeposited. R.Vol. III at 599.

**8.** These forces have come about most probably from the firing of the string shots inside of the tubing itself, creating very high pressures, the overpressurization causing, swelling, belling of the tube, which you see also direct evidence here. If you put a straight edge on this, this is curved which means its swelled out.
Deposition of John Harcourt, R.Vol. III at 683.

**9.** "[T]here is also a problem of getting that down inside because ... we're creating a sand pack on the outside continuously ... filling in up the hole and this is becoming tighter and tighter." *Id.* at 684.

**10.** MR. BURKETT: He's identified them. I would like to object to the exhibits, Your Honor, because the witness has already testified that there is no evidence that frac balls had anything to do with the clogging up or sticking of this tool.
THE COURT: Well, that goes to the weight of the testimony, though, rather than the admissibility of it. Overruled. Go ahead. R.Vol. VIII at 46–47.

**11.** For example, Marino used Harcourt's deposition testimony that the notching of the tool did not affect its hardness in attempting to impeach Harcourt's trial testimony that well debris caused the sections of the overshot in between the notches to deflect inward onto the mandrel. R.Vol. VIII at 55–56. He also used Harcourt's deposition testimony in attempting to show that

Harcourt had no specific knowledge about the notches' affect on the circulation down the well, *id.*, and to show that Harcourt's trial testimony about the possibility of a frac ball being caught in the notches was nothing more than a possibility unsupported by evidence. *Id.* at 60–61.

**12.** Marino asserts that he was surprised and prejudiced in that Harcourt's testimony "causally connected the alleged Notching and the failure of the Packer once and for all. There had been no notice that such testimony would be offered until the eve of trial." Brief for Appellant at 29. Nonetheless, a reading of Harcourt's deposition shows that it was the very thrust of his deposition testimony to establish such a causal connection; hence this connection could neither have been new or unexpected by Marino. Thus, this case is easily distinguished from *Smith v. Ford Motor Co.*, 626 F.2d 784 (10th Cir.1980), *cert. denied,* 450 U.S. 918, 101 S.Ct. 1363, 67 N.E.2d 344 (1981), where the surprise witness's deposition was never taken due to the misleading description of that witness's testimony included in the pretrial order.

**13.** Rather than moving for a continuance, counsel began an immediate, vigorous, and effective cross-examination of the witness. *See* note 11, *supra.* Counsel's cross-examination does not bear the marks of one whose ability to test a witness has been impaired by surprise testimony and his failure to request a continuance suggests that he felt no such impairment. Again, unlike *Smith,* there is no suggestion that the witness could have been unavailable to testify had a continuance been granted.

circumstances. As we said in *Greenwood v. McDonough Power Equipment Inc.*, 731 F.2d 690, 697 (10th Cir.1984):

> "Although counsel ... objected and alleged surprise when [defendant's witness changed his testimony at trial] there has been a failure to establish that [the witness's] testimony was prejudicial. [Plaintiffs] did not move for a continuance nor have they displayed the manner in which [the witness's] observation prejudiced them or what steps they may have pursued to cure the alleged prejudice."

*See also Id.* at 698 (McKay, J., concurring) (trial court acted within discretion in admitting evidence that had not been revealed in the pretrial order or other discovery responses when the plaintiffs failed to seek a continuance or other remedy); 6A J. Moore, *Moore's Federal Practice* ¶ 59.08[2] (2d ed. 1986).

Marino has received his day in court, and although his trial may not have been error free, it was sufficiently proper in all respects to afford his case a fair hearing before a jury. He presents no error sufficient to merit a new trial.

### III.

█ As the prevailing party at trial, Otis moved pursuant to Okla. Stat. tit. 12 § 940(A) for recovery of its attorneys fees from Marino. The statute provides:

> "In any civil action to recover damages for the negligent or willful injury to property and any other incidental costs related to such action, *the prevailing party shall be allowed reasonable attorney's fees,* court costs and interest to be set by the court and to be taxed and collected as other costs of the action."

(emphasis added). The court ruled that there was no entitlement to attorney's fees in this case. R. Vol. X at 5. Otis argues that the judge erred because the plain terms of the statute entitle Otis to recover its attorney's fees. Otis argues that this suit was brought for the negligent destruction of property, that it successfully defended the suit, and that the Oklahoma statute at issue makes the award of attor-

ney's fees mandatory in cases such as these. *See Clark v. Miller*, 631 P.2d 1343, 1345 (Okla.Ct.App.1981).

Marino, on the other hand, argues that the judge ruled correctly because an oil and gas lease is not in itself property but rather a property right which does not fall under the terms of the statute. He argues that his oil and gas lease is merely the right to obtain what oil and gas he can from his lease and that this oil and gas does not constitute property until it has been reduced to possession. Accordingly he argues, he was not suing for damage to property, but for damage to a property right not covered under § 940(A). He cites for this proposition language from the Oklahoma Supreme Court's decision in *Woods Petroleum Corp. v. Delhi Gas Pipeline Corp.*, 700 P.2d 1011, 1012–13 (Okla.1984). In *Woods Petroleum*, however, the plaintiff sued the defendant for mismeasuring and thus negligently taking gas which plaintiff was selling to the defendant. Plaintiff won the case and was awarded attorney's fees in the trial court below under § 940(A). The Oklahoma Supreme Court reversed the award of attorney's fees, noting that the plaintiff had an ownership right in the gas, but the statute did not grant attorney's fees for any interference with an ownership right, it required actual physical damage to property before attorney's fees would be awarded to the prevailing party. Thus the court held that § 940(A) applies only to prevailing parties in "actions for damages for the negligent or willful *physical* injury to property." *Woods Petroleum*, 700 P.2d at 1013 (emphasis in original).

Marino's attempt to distinguish property from property rights in this case must fail. His lease has been devalued, if at all, because of the physical damage caused to the lease properties in milling out the packer from the well itself. Marino himself alleges that "Marino sought compensation for damages to geological formations which would have yielded oil and gas had Otis not ruined the well." Reply and Response Brief of Appellant at 25. Such allegations center around the physical injury to proper-

ty and thus fall within the mandatory coverage of § 940(A) authorizing the recovery of attorney's fees. Accordingly, Otis should have been granted such fees by the district court.

On appeal, Otis also requests that it be awarded reasonable attorneys fees necessitated by the present appeal. The Oklahoma Supreme Court has interpreted § 940(A) to allow additional fees to the prevailing party "for legal services rendered in the appellate court." *Sisney v. Smalley,* 690 P.2d 1048, 1051 (Okla.1984). Accordingly, we grant Otis's request and remand to the trial court to calculate the amount of reasonable attorney's fees due to Otis for the proceeding in the trial court and on appeal according to the guidelines established in *State ex rel. Burk v. City of Oklahoma City,* 598 P.2d 659 (Okla.1979), and *Sisney,* 690 P.2d at 1051.

It is thus ordered that the district court's judgment be AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

TIMBERS, Circuit Judge, dissenting:

I regret that I am unable to join in the majority's comprehensive, innovative opinion. Since I believe that the cumulative effect of the two errors committed at trial —admission in evidence of an unpled defense and admission in evidence of surprise expert testimony—unjustly prejudiced appellant, I would reverse the judgment entered on the jury verdict and remand the case for a new trial.

(A) *Evidence of Contributory Negligence of Appellant.*

Rule 8(c) of the Federal Rules of Civil Procedure provides:

> "**(c) Affirmative Defenses.** In pleading to a preceding pleading, a party shall set forth affirmatively accord and satisfaction, arbitration and award, assumption of risk, contributory negligence, discharge in bankruptcy, duress, estoppel, failure of consideration, fraud, illegality, injury by fellow servant, laches, license, payment, release, res judicata, statute of frauds, statute of limitations, waiver, and any other matter constituting an avoidance or affirmative defense. When a party has mistakenly designated a defense as a counterclaim or a counterclaim as a defense, the court on terms, if justice so requires, shall treat the pleading as if there had been a proper designation."

"If such defenses are not affirmatively pleaded, asserted with a motion under Rule 12(b) or tried by the express or implied consent of the parties, such defenses are deemed to have been waived and may not thereafter be considered as triable issues in the case." *Radio Corporation of America v. Radio Station KYFM, Inc.,* 424 F.2d 14, 17 (10th Cir.1970). The Supreme Court strictly enforces the rules it has prescribed. *See Taylor v. Illinois,* —— U.S. ——, 108 S.Ct. 646 (1988) (upholding sanction precluding witness from testifying where counsel had failed to comply with discovery rules).

In the instant case I would hold that the defense of appellant's contributory negligence was waived and, accordingly, no evidence should have been admitted on the issue. The defense was never affirmatively pleaded nor was it asserted with a motion under Fed.R.Civ.P. 12(b). Most assuredly, it was not tried with the consent of the parties. When it appeared, due to the opening statement of appellee's counsel, that appellee considered the defense to be an issue triable to the jury, appellant immediately moved in limine to exclude any evidence of its own contributory negligence. Specifically, appellant urged that any defense based on an alleged alteration of the packer by so-called "notching" of that piece of equipment should be excluded. After argument in chambers, the court agreed with appellant and granted the motion, stating: "A general denial ... tells the other side nothing. You [appellee] said you were going to [file an amended answer], pleading these defenses, and you didn't do it. So you're not going to be allowed to put on any evidence of it...." The court was eminently correct in this ruling.

Notwithstanding the ruling, however, the court permitted evidence of appellant's contributory negligence in notching the packer

to permeate the entire trial, under the guise of "causation".[1] To me, the difficulty in following the lower court's rationale is that, under its approach, contributory negligence would *never* have to be pled. By emphasizing the notching evidence as a break in the chain of causation, appellee succeeded in trying and submitting to the jury the improper issue of "who was negligent—Otis *or Marino?* " when the issue, as set forth clearly in the pleadings, was appellee's negligence alone. This was error.

(B) *The Surprise Expert Testimony.*

Rule 26(e) of the Federal Rules of Civil Procedure expressly imposes a continuing duty on a person who responds to a discovery request to make seasonable supplemental responses with respect to, among other facts, "the identity of each person expected to be called as an expert witness at trial, the subject matter on which the person is expected to testify, *and the substance of the person's testimony.*" Fed.R. Civ.P. 26(e)(1) (emphasis added). The rule further requires a party to amend a prior response seasonably if the party "obtains information upon the basis of which ... the party knows that the response was incorrect when made". Fed.R.Civ.P. 26(e)(2). In the instant case, the concealment of experiments, and the results thereof, performed by appellee's expert *after* his deposition, which results contradicted his deposition testimony, assured a trial by ambush when the expert was permitted to testify to them.

Two weeks prior to trial appellant took the deposition of appellee's expert, John Harcourt. At that time, when questioned regarding the possible impact of notching on the packer, Harcourt responded that he had not reached any conclusions on notching and therefore could not quantify the effect, if any. He stated that sand which had been trapped in the packer "would be enough by itself" to cause the packer to become stuck. This was precisely the conclusion appellant had reached and, in fact, was the basis of its lawsuit.

Shortly after Harcourt's deposition, he performed a series of experiments which allegedly demonstrated that the notching of the packer created three conditions which caused the packer to malfunction. At no time prior to the eve of trial, however, did Harcourt amend his deposition testimony to enable appellant to be put on notice of Harcourt's findings. As soon as appellant was advised that Harcourt might testify in contradiction to his deposition testimony, appellant moved, as part of its motion in limine, to exclude such testimony. As stated above, that motion was granted. The court said:

"I'm going to sustain any objection to further testimony that might tend to enlarge upon the testimony that this witness gave at deposition, the result of any test taken since then for the reasons that you didn't supply the other side with the results of the test or whatever, and the rules are clear that you have a continuing obligation to update the answers to interrogatories or the demand for production or whatever as new evidence that may come to light, and apparently didn't do it in this case."

Notwithstanding this ruling, however, appellee nevertheless was permitted to elicit testimony regarding the experiment's results. Harcourt—having given deposition testimony which supported appellant's case —was permitted to testify at trial that the notching caused the failure of the packer. The prejudice which redounded to appellant from this surprise testimony, for which it was unprepared, simply could not be overcome. It cast a reversible pall over the entire trial.

To summarize:

Appellant was unjustly prejudiced by the cumulative effect of the two errors in the admission of evidence regarding the notching of the packer. First, in view of appellee's total failure ever to articulate an affirmative defense based on notching of the

---

1. "What's in a name? That which we call a rose by any other name would smell as sweet." W. Shakespeare, *Romeo and Juliet,* Act II, Scene ii, line 43.

packer, the evidence was erroneously admitted under the guise of causation. Second, due to the breach of the duty to supplement, it was error to permit Harcourt to testify in contradiction to his deposition testimony. The cumulative effect of these errors requires a new trial.

I respectfully dissent.