Gary SMITH, Plaintiff-Appellant,

v.

ATLANTIC RICHFIELD COMPANY, a Pennsylvania corporation; and Anaconda Minerals Corporation, a Delaware corporation, Defendants-Appellees.

No. 85–2072.

United States Court of Appeals, Tenth Circuit.

March 25, 1987.

W. Brent Wilcox (Edward B. Havas and Christopher M. Mislow, with him, on brief), of Giauque & Williams, Salt Lake City, Utah, for plaintiff-appellant.

Ray R. Christensen of Christensen, Jensen & Powell, Salt Lake City, Utah, for defendants-appellees.

Before BARRETT, SETH and LOGAN, Circuit Judges.

BARRETT, Circuit Judge.

Gary Smith appeals from the judgment entered in favor of Atlantic Richfield Company (ARCO), pursuant to a jury verdict in this personal injury case. Smith, a coal miner employed in the Beaver Creek No. 2 mine, was severely injured by a piece of rock that fell from the roof of the mine while he was on duty in May, 1982.

At all times relevant to this case, the Beaver Creek Coal Company (Beaver Creek) was a wholly-owned subsidiary of ARCO. Smith was employed by Beaver Creek. Beaver Creek was not a party to this lawsuit, pursuant to operation of the Utah Workmen's Compensation statute. Smith alleged that ARCO was negligent in rendering services relative to mine safety measures and that his injuries resulted therefrom.

One of the decisive issues for jury determination was whether Beaver Creek was, in fact, autonomous or whether ARCO was actually managing the mine or managing the safety aspects of the mine at the time of Smith's injuries. The jury could not find ARCO liable to Smith unless ARCO was managing the mine or the safety aspects of the mine. The evidence at trial showed that although ARCO and its employees stood ready to provide guidance in safety and other matters, Beaver Creek's opera-

tion was in many respects autonomous. For example, when ARCO acquired ownership of Beaver Creek, the individual who had been president of Beaver Creek continued in that position. When a new president was hired, he found that ARCO would give "general guidance" on safety matters but this would be only upon request. A training manual on "retreat mining" methods (explained below), prepared by ARCO engineers, was prepared at the request of Beaver Creek and was a compilation of methods already in use at Beaver Creek. Beaver Creek had its own management, its own payroll and its own safety organization.

The ARCO witnesses testified that their role was one of support, and that Beaver Creek management made the day-to-day decisions. ARCO's Manager of Safety and Occupational Health testified he had no relationship with the safety organization at Beaver Creek, although he sometimes provided Beaver Creek with material or manpower or would respond to requests for assistance in the mine. On the other hand, the management of the Beaver Creek Mine was directly answerable to ARCO and received much advice and direction from ARCO on geologic matters.

The second decisive issue for jury determination was whether there was sufficient evidence of ARCO's negligence causally related to the injuries sustained by Smith. It was Smith's position that his injuries were the result of a defective roof in the mine and that ARCO was responsible for the defective condition.

All coal mines were required to submit roof control plans to the Mine Safety And Health Administration (MSHA), a federal regulatory agency that oversees coal mine operations and whose function is to help ensure safe mine conditions. *See,* 30 U.S.C. § 801; 30 U.S.C. § 862. Beaver Creek's plan was prepared by the operations and safety personnel of Beaver Creek and had been approved by MSHA. This approval involved an inspection of the mine, as well as acceptance of the roof control plan. "Roof control" was the process of keeping pieces of rock from falling out of the roof and injuring or killing miners or damaging equipment. Roof control was considered the paramount safety problem in underground coal mines.

Various methods of roof control were commonly employed, including bolting steel straps ("matting") to the roof of the mine, covering it with a metal mesh material ("meshing") or placing bolts at intervals to keep the roof up. The testimony was conflicting on whether there was a need for full matting or meshing of the roof in the "A" panel of the mine where Smith was injured. It was undisputed that this portion of the mine was prone to rock falls due to a "slickenside" condition, which was caused by small geologic faults which have slick, polished surfaces to which surrounding rocks will not adhere.

Smith contended that roof control was, to some extent, left to the discretion of the mine foreman, but that there was evidence that various employees of ARCO were assigned to the Beaver Creek mine from time to time who were given responsibility for safety matters, including roof control problems. ARCO argued that roof control was solely the concern of Beaver Creek management, and that if it was left to the discretion of the foreman, that too was Beaver Creek's decision. It was undisputed that visual inspection, by a foreman or a miner, would not reveal the existence of a slickenside condition. There did not seem to be any disagreement, moreover, that the cause of the rock fall that injured Smith was this slickenside condition.

At the time Smith was injured, the crew in the "A" panel were engaged in retreat mining which is a procedure in which pillars of coal, originally left in as roof support, are mined out. The result is a controlled cave-in as the mining crew retreats. There was evidence that in this procedure, roof control can be more difficult than usual, due to air slacking or weakening of the rocks in the interval (frequently a year or more) between the time the crew first opens up the tunnel and the time it retreat mines the tunnel.

Prior to trial, Smith filed a motion in limine requesting that ARCO not be permitted to introduce evidence that MSHA had approved the roof control plan or had

inspected the mine. This motion was denied. During the course of the trial, Smith interposed objections to evidence concerning MSHA. The objections were overruled. Smith also sought to introduce expert testimony to the effect that ARCO had been negligent in its supervision of Beaver Creek's safety organization and in providing safety services to Beaver Creek. The court sustained ARCO's objection to such evidence. After a three-week trial, the jury returned a general verdict in favor of ARCO, from which Smith appeals.

### Contentions on Appeal

Smith contends that certain evidentiary rulings were clearly erroneous. He argues that the trial court erred in: (1) refusing to allow Smith's expert witness to testify whether ARCO was negligent in rendering roof control services and whether that negligence was the proximate cause of his injury; (2) denying Smith's motion in limine to exclude testimony referring to MSHA, and evidence of MSHA's approval of the roof control plan; and, (3) permitting ARCO to argue that MSHA's approval of the roof control plan constituted evidence that the roof control practices were sufficient.

ARCO maintains, on cross-appeal, that the trial court should have granted its motion for summary judgment, since, as Beaver Creek's alter ego, it is shielded from liability by the Utah Workmen's Compensation statutes to the same extent as Beaver Creek.

### I.

Smith's expert witness, Mr. Heers, testified at length about shortcomings in the operation of the Beaver Creek mine, particularly in roof control methods. His testimony could have implied negligence on the part of the Beaver Creek Coal Company management or on the part of ARCO, depending on whether the finders of fact determined: 1) that Beaver Creek was an autonomous operation, 2) that ARCO was in effect the operator of Beaver Creek, or 3) that Beaver Creek delegated and ARCO assumed responsibility over safety matters. There was ample evidence in the record from which the jury could have inferred

any of these facts. Indeed, the questions and answers were framed in terms of "the prudent mine operator." (R., Vol. VIII, pp. 1000–09.) It was the jury's task to decide the identity of the "prudent mine operator" about whom Heers testified.

After Heers' testimony about general conditions in the mine, the following colloquy took place:

SMITH'S COUNSEL: Now do you have an opinion as to whether or not the acts and omissions of ARCO as you've understood them from your view of the facts and the evidence in this case in regard to the Beaver Creek No. 2 operation, including the "A" panel, were prudent mine practices?

ARCO'S COUNSEL: I'll object to this as calling for a legal conclusion and asking him to pass upon a totally legal issue.

THE COURT: I'll sustain the objection and suggest you put your next question.

(R., Vol. VIII, p. 1008.)

Smith's counsel asked the same question following a series of foundation questions about Heers' experience in mining activities. ARCO again objected, on the ground that it was the same question and because it required the witness to pass on the credibility of all the witnesses. The court again sustained the objection. (R., Vol. VIII, p. 1009). There followed a series of questions in which Smith's counsel attempted to elicit Heers' opinion about whether the failure to put up supplementary roof support caused the rock to fall on Smith. Heers was eventually permitted to express his opinion that additional safety measures would have prevented Smith's accident and injuries. (R., Vol. VIII, pp. 1013–14.) Although Smith's counsel did not mention ARCO by name, there was ample evidence in the record from which the jury might have deduced ARCO's liability from Heers' testimony. Moreover, on cross-examination, Heers reiterated his opinion that the safety measures in the Beaver Creek mine were inadequate. (R., Vol. VIII, p. 1046.)

Smith contends on appeal, however, that the court essentially eviscerated his case by sustaining ARCO's objections to his questions specifically about ARCO.

ARCO contends that the trial court properly sustained its objections to the line of questioning described above, because Heers' opinion would have been expressed on an ultimate issue solely within the jury's domain: Who was the operator of the Beaver Creek mine?

█ We agree that the trial court did not err in sustaining ARCO's objections. The above quoted question put to Heers called for a legal conclusion in that it assumed ARCO was the mine operator. Moreover, in our view, the question was hopelessly vague. Smith's counsel spoke of "acts and omissions of ARCO" but did not cite any acts or omissions to which the opinion should apply. The question that followed again referred to ARCO's unidentified acts and omissions. Thus, counsel for Smith failed to lay a foundation regarding acts or omissions of ARCO, and he failed to make an offer of proof under Fed.R.Evid. 103(a)(2). Under Rule 702, Fed.R.Evid., 28 U.S.C., scientific, technical or other specialized knowledge *which will assist the trier of fact* is admissible as opinion evidence. Here, an opinion was sought based upon unspecified and unidentified acts and omissions of ARCO. Such could not be the foundation to an expert opinion relative to prudent mine practices. An answer could not have assisted the trier of fact. The admissibility of expert testimony is within the broad discretion of the trial court, and is reviewed for abuse of discretion only. *Quinones v. Pennsylvania General Ins. Co.*, 804 F.2d 1167, 1171 (10th Cir.1986); *Ramsey v. Culpepper*, 738 F.2d 1092, 1101 (10th Cir.1984).

We do not find merit in Smith's contention that his case was truncated by the trial court. The record reflects evidence of specific acts and omissions of ARCO, which may have contributed to Smith's injuries. During closing arguments, Smith's counsel argued forcefully and well relative to specific examples of ARCO's conduct which may have caused Smith's injuries. We believe this to be a case where special interrogatories to the jury would have been helpful in sorting out this appeal. Nevertheless, we cannot conclude that the trial court erred in excluding this proffered opinion evidence.

We have held that the trial court's conduct of trial proceedings, including rulings on motions and objections, will not be disturbed on appeal unless it affirmatively appears from the record that the trial court abused its discretion. *Rasmussen Drilling v. Kerr-McGee Nuclear Corp.*, 571 F.2d 1144 (10th Cir.), *cert. denied*, 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978). We see no abuse of discretion in the court's limitation of Heers' testimony.

█ In *Rasmussen Drilling*, we also held that no error in a ruling or order or in the admission or exclusion of evidence or in anything done or omitted by the trial court shall be grounds for granting a new trial or setting aside a verdict unless the error or defect affects the substantial rights of the parties. *Id.* at 1149. Assuming *arguendo* that error could be found, we hold that inasmuch as there was ample evidence of ARCO's involvement in the Beaver Creek mine, whether it be as operator or as advisor, the exclusion of opinion evidence specifically addressing ARCO's mining practices did not adversely affect Smith's substantial rights.

We do not believe, as Smith contends, that the jury was misled into concluding that Beaver Creek alone was at fault in causing Smith's injuries. The jury heard testimony that: ARCO employees were assigned to the Beaver Creek mine and performed safety functions from time to time; Beaver Creek's safety manager did not report to anyone and considered safety matters to be his responsibility alone; ARCO had geologic knowledge and resources that Beaver Creek did not have; and Beaver Creek's management answered to ARCO's management. In short, the jurors heard sharply conflicting testimony. The jury apparently did not find ARCO's role significant enough to result in a finding of liability. We do not believe that with Heers' proffered testimony before them, the jury would have reached a different conclusion.

## II.

Smith argues vehemently that he was prejudiced by the trial court's refusal to grant his motion in limine to exclude refer-

ences to MSHA during the trial. He also contends it was error to allow evidence of MSHA's approval of the Beaver Creek roof control plan to go to the jury.

We do not have before us a transcript of the hearing on Smith's motion in limine, nor do we have a written ruling by the court. Thus, we could simply speculate as to the arguments raised by plaintiff, as well as the court's reasons for denying the motion. It appears from the record, however, that the court made case-by-case rulings on references to MSHA as objections were raised. By no means was ARCO given, nor did ARCO make, unrestricted use of evidence regarding MSHA during the course of the trial. We observe, as well, that whenever the subject of MSHA was broached during trial, Smith's objections were to its relevance. Smith's motion in limine asserted that the prejudicial impact of such evidence would outweigh its probative value. Smith further argues, apparently for the first time on appeal, that this evidence was objectionable as hearsay and was not covered by any of the exceptions enumerated in Rule 803, Fed.R.Evid., 28 U.S.C. He also contends that evidence of MSHA approval was in the nature of expert testimony, yet was admitted without proper foundation as required by Rule 702. Finally, Smith claims that the evidence in question violates the best evidence rule, Rule 1002 Fed.R.Evid.

In *Markel Service, Inc. v. National Farm Lines*, 426 F.2d 1123 (10th Cir.1970), we held that a specific overruled objection protects the record to the extent of the ground specified, but does not avail the party of other grounds that could have been raised but were not. *Id.* at 1128. Thus, in the absence of plain error, we need not consider grounds for objection which were not raised at trial.

To determine whether the court's admission of the MSHA evidence was plain error, assuming the validity of the objections Smith failed to make and now raises on appeal, we must again determine whether either party's rights were prejudiced. *Rasmussen Drilling v. Kerr-McGee Nuclear Corp.*, 571 F.2d at 1149. For reasons hereinafter discussed, we hold there was no prejudice to the rights of the parties. In

our view, the MSHA approval evidence was not decisive to the outcome of this case.

Moreover, a hearsay objection would not have been well founded. Rules 803(24) and 804(b)(5), Fed.R.Evid. (known as "catchall exceptions" to the hearsay rule), provide trial courts with a great deal of leeway on questions of hearsay. Even if the evidence of MSHA's approval had not fit, for some reason, under Rule 803(8) as a record of a public agency, it no doubt would have been admissible under one of the catchall categories. *See*, 2 D. Louisell and C. Mueller, *Federal Evidence* § 158 at 362–363 (rev. ed. 1985). Smith's assertion that the MSHA evidence was expert testimony, without proper foundation, is without merit. Finally, Smith's contention that the MSHA evidence violated the best evidence rule must fail. The witnesses did not testify in any detail to what was contained in the documents evidencing MSHA's approval. The witnesses testified simply that MSHA approval existed. There was no violation of Rule 1002.

We turn now to the objections raised at trial. We hold that the few references to MSHA's approval of the roof plan were not so prejudicial that they constituted plain error. This was a three-week trial involving much evidence and numerous witnesses. As far as we can determine from the record, only two references were made to MSHA's approval: one by Heers and one by another of Smith's witnesses. Further, Heers referred to the MSHA approval as evidencing a minimum standard (R., Vol. VIII, p. 1020), but not a prudent minimum standard. We do not believe that, in the totality of the circumstances, a contrary result would have been reached if the evidence in question had been excluded. Smith was not prejudiced by its admission.

As to Smith's argument that the evidence of MSHA approval was irrelevant and excessively prejudicial, we again note that under the standards articulated in *Rassmussen Drilling v. Kerr-McGee Corp.*, 571 F.2d at 1149, we must find an abuse of the trial court's discretion amounting to prejudice to the rights of Smith before we will disturb the verdict.

To be relevant, evidence of MSHA's approval of the roof control plan must tend to make "the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, Red.R.Evid. In this case, the jury had to determine whether the safety measures, if any, taken by ARCO on behalf of the Beaver Creek miners were negligent and, if so, whether that negligence was the proximate cause of Smith's injuries. Thus, the existence of approval of safety measures by a government agency solely dedicated to safety is indeed relevant. It permits an inference that at least a minimum standard of care was met. In an analogous case, *Bruce v. Martin-Marietta Corp.*, 544 F.2d 442 (10th Cir.1976), we held that:

> Compliance with governmental air safety regulations is admissible, but not conclusive, evidence in a suit arising out of an airplane crash [citations omitted].... [In] a case arising out of a Maryland plane crash, [r]ecovery was sought on the grounds of negligence and express and implied warranty. Applying Maryland law, the court said that federal air safety regulations 'whose purpose is' to promote safety of flight of civil aircraft,' ... seem to us to be relevant and useful evidence on the standard-of-care issue, and we think them admissible under the federal practice.'

*Id.* at 446.

■ Smith attempts to distinguish *Bruce v. Martin-Marietta Corp.* by differentiating between evidence of a company's compliance with regulations, which he argues is relevant, and evidence that *the government* has determined a company to be in compliance with regulations, which he asserts is only marginally relevant. This strikes us as a distinction without a difference, and certainly not one that was made in *Bruce.* We do not believe it would have mattered how ARCO introduced the evidence, or that its relevance would be affected, chameleon-like, by its mode of presentation. We have found no cases specifically addressing the question of whether compliance with MSHA regulations (or approval by MSHA of a roof control plan, which amounts to compliance with MSHA regulations) is admissible to show the standard of care. We hold that the general rule stated in *Bruce v. Martin-Marietta Corp., Id.* at 446, applies with equal force to this case. *See also, Dorsey v. Honda Motor Co., Ltd.,* 655 F.2d 650, 656 (5th Cir.1981), *modified,* 670 F.2d 21, *cert. denied,* 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982); Restatement (Second) of Torts § 288C; 58 A.L. R.3d 148 (1974); discussing similar evidence in other contexts.

■ The question of whether the relevance of the evidence concerning MSHA is outweighed by its prejudicial impact is more problematical. We acknowledge that the effect on a jury of the government's "seal of approval" should not be underestimated. The effect on the jury can only be prejudicial, however, if we can reasonably conclude that, without the evidence, there would have been a contrary result. This we cannot conclude. The evidence of MSHA approval was by no means the sole evidence exonerating ARCO, and we have no reason to believe it was the only factor or even a major factor leading to the jury's verdict.

■ As a corollary to his assertion that he was prejudiced by references to MSHA's approval of the roof plan, Smith complains that the jury was not told what standards MSHA applied in giving its approval, leaving it free to speculate. We observe, however, that during the trial, Smith did not offer any evidence of the MSHA standards in order to cure the defect of which he now complains. In our view, this evidence would have been helpful to the jury. However, it was not crucial evidence. In any event, Smith's failure to offer in evidence the documentation associated with MSHA's approval of the roof control plan makes it unnecessary for us to consider this contention on appeal.

### III.

Smith contends that the trial court erred in permitting ARCO to state in its closing argument, "Do you suppose for one moment that MSHA would have tolerated a manifestly unsafe roof control plan?" (R., Vol. XI, p. 35). Smith argues that this

statement was prejudicial because it suggested that MSHA's approval established that ARCO satisfied the dictates of due care when in fact the approval merely represents compliance with minimum government standards.

■ While we have held that this evidence was relevant and admissible to show the minimum standard of care, ARCO's closing remarks implied that the MSHA approval was conclusive on the issue of negligence. In this respect, the argument was clearly improper. As noted above, *Bruce v. Martin-Marietta Corp., Id.*, holds that compliance with governmental safety regulations is admissible only to show the minimum standard of care. Further, such standards are not conclusive on the issue.

■ We will not reverse on an improper argument, however, unless it obviously prejudiced one of the parties. We have reviewed the closing arguments in their entirety. We believe that ARCO's argument was balanced and covered the range of evidence presented at the trial. Although counsel for ARCO did imply to the jury that the evidence of MSHA's approval of the roof control plan was more significant than it was, the point was not overemphasized in consideration of the entire context of the argument. We do not believe that ARCO's argument prejudiced Smith in the sense that it turned the tide in ARCO's favor. We note, moreover, that ARCO made no further use of the MSHA evidence after Smith's objection. We hold that the trial court did not abuse its discretion in overruling Smith's objection to ARCO's closing argument.

### IV.

We turn now to ARCO's cross-appeal on the question of whether the trial court should have granted ARCO's motion for summary judgment on the basis of immunity conferred by the workmen's compensation statutes.

■ ARCO argues that Smith was on the horns of a dilemma: if he established too thoroughly that Beaver Creek was under the control of ARCO and that they were essentially one entity, ARCO would then be subject to the same immunity as

Beaver Creek under the Utah Workmen's Compensation Act. On the other hand, if Beaver Creek's operation were completely autonomous, Smith's claim must fail because under *Love v. Flour Mills of America*, 647 F.2d 1058 (10th Cir.1981) and *Boggs v. Blue Diamond Coal Co.*, 590 F.2d 655 (6th Cir.), *cert. denied*, 444 U.S. 836, 100 S.Ct. 71, 62 L.Ed.2d 47 (1979), a parent company is liable only for its independent acts of negligence. A parent cannot be liable merely for failing to perform its subsidiary's duty or failing to require the subsidiary to perform its duty. *Love v. Flour Mills of America, Id.* ARCO contends that either way, it was entitled to summary judgment.

■ We disagree that Smith faced such a dilemma. The evidence showed that Beaver Creek and ARCO were separate corporations with different management and discrete corporate personalities. The Beaver Creek employees knew who the ARCO employees were. Beaver Creek had its own president, its own payroll, its own safety organization. Moreover, in *Love v. Flour Mills of America*, we disapproved any attempt by a parent company to "avoid the consequences of its separate corporate identity to claim immunity, as an alter ego employer of its subsidiary employer's injured employees." *Id.* at 1062. Even if Smith had established pervasive and extensive control of Beaver Creek by ARCO, he would not have been relieved of the burden of establishing some independent act of negligence on ARCO's part. And ARCO's contention that there is no evidence of an independent act of negligence is not well founded, at least for purposes of summary judgment. ARCO was not entitled to judgment as a matter of law.

■ In *Brown v. Parker-Hannifen Corp.*, 746 F.2d 1407, 1411 (10th Cir.1984), we held that in determining whether there was a genuine issue of material fact, if an inference can be deduced from the facts whereby the non-movant could recover, summary judgment is inappropriate. In this case, the fact that ARCO was providing safety advice and services could have been deduced from the evidence. Whether

Beaver Creek delegated this responsibility to ARCO and whether ARCO performed it negligently were questions of fact. *See, Canipe v. National Loss Control Service Corp.,* 736 F.2d 1055 (5th Cir.1984). We hold that the trial court did not err in refusing to grant summary judgment to ARCO.

ARCO alternatively contends that it was entitled to a directed verdict. A directed verdict is appropriate only when the facts and inferences, viewed most favorably to the nonmoving party, point so strongly in favor of the moving party that reasonable minds could not come to a different conclusion. *Saye v. St. Vrain Valley School Dist. RE–IJ,* 785 F.2d 862 (10th Cir.1986). The evidence in this case does not fit this criterion. A directed verdict would not have been appropriate.

AFFIRMED.

LOGAN, Circuit Judge, concurring:

While I agree with the result reached by the majority opinion, I do not agree with all of the legal propositions stated therein. In part I, I agree that the district court did not abuse its discretion in refusing to allow Smith's expert to answer the question discussed. If I thought otherwise, however, I would not find the error harmless as the majority has done. Prior to final argument, there were only two references in front of the jury to MSHA approval of the roof control plan. These were so innocuous they could not possibly have prejudiced Smith. Therefore, in Part II I would not have discussed the hearsay, best evidence, foundation or relevancy objections. I agree that the reference to MSHA's approval by ARCO's counsel in closing argument is more serious and was improper, but in the context of the entire closing argument and the whole trial it does not justify reversal. Because we affirm the jury's determination in ARCO's favor, I would not discuss any of the issues raised in ARCO's cross-appeal.