**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 2, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

SUNDANCE ENERGY OKLAHOMA,
LLC, d/b/a SEO, LLC; SUNDANCE
ENERGY, INC.,

      Plaintiff Counter Defendants -
Appellees,

v.

DAN D. DRILLING CORPORATION,

      Defendant Counterclaimant -
Appellant.

Nos. 15-6103 & 15-6135

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:13-CV-00991-R)**
_____

George W. Dahnke (Sarah J. Timberlake and April B. Eberle, with him on the briefs),
Abowitz, Timberlake & Dahnke, P.C., Oklahoma City, Oklahoma, for Appellants.

Mark Blongewicz (Robert P. Fitz-Patrick and Sharon T. Thomas, with him on the brief),
Hall, Estill, Hardwick Gable, Golden & Nelson, P.C., Tulsa, Oklahoma, and Oklahoma
City, Oklahoma, for Appellees.
_____

Before **GORSUCH**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

**MORITZ**, Circuit Judge.
_____

Sundance Energy Oklahoma, LLC, brought suit against Dan D. Drilling Corporation for damages resulting from the total loss of an oil and gas well. A jury found against Dan D., and the district court denied its motion for a new trial. Dan D. appeals, arguing the district court erred in (1) giving one jury instruction and omitting another; (2) admitting certain evidence; and (3) awarding Sundance attorney's fees. Finding no reversible error, we affirm.

## BACKGROUND

Sundance contracted with Dan D. to drill seven oil and gas wells in June 2012. For each of those wells, Sundance and Dan D. executed a single-well contract (collectively, the June 2012 contracts). The June 2012 contracts used an industry-standard International Association of Drilling Contractors (IADC) form, with only minor changes to the form's language. Notably, in each of the June 2012 contracts, the parties left section 14 of the IADC form, titled "RESPONSIBILITY FOR LOSS OR DAMAGE, INDEMNITY, RELEASE OF LIABILITY AND ALLOCATION OF RISK," substantially unaltered. App. vol. 16F, 3813. In relevant part, that section provides, "In the event the hole should be lost or damaged, [Sundance] shall be solely responsible for such damage to or loss of the hole." *Id.* at 3814. That section further explains:

> [I]t is the intent of [the] parties hereto that all releases, indemnity obligations and/or liabilities assumed by such parties under [the] terms of the Contract . . . be without limit and without regard to the cause or causes thereof, including but not limited to . . . the negligence of any degree or character (regardless of whether such negligence is sole, joint or concurrent, active, passive or gross) of any party or parties . . . ."

2

*Id.*

Dan D. ultimately drilled only two of the seven wells due to Sundance's inability to secure proper leases and drilling permits for the other five. In lieu of the undrilled wells, Sundance asked Dan D. to drill a different group of wells—including one known as the Rother well—and hired Tres Management to provide engineering services and an onsite supervisor known as a company man for this work. In early December 2012, Dan D. signed a multi-well contract (the December 2012 contract) for these new wells. And although Sundance received the signed December 2012 contract—which included terms similar to those contained in the June 2012 contracts—Sundance asserts that its in-house counsel never reviewed or signed the contract before Dan D. began work on the Rother well.

Despite the absence of an executed contract, Dan D. began drilling the Rother well on December 2, 2012, under the supervision of Tres' company man. On December 9, 2012, Dan D.'s drill pipe became stuck in the hole. After several failed attempts to remove the drill pipe, the company man instructed Dan D.'s employees to stop pulling on the stuck pipe. A driller on the rig ignored these instructions and continued to try to remove the equipment. During these attempts, the drilling line—a thick, coiled steel rope routed through derrick and used to raise or lower the drill string using a pulley system—parted, and portions of the drill rig known as the traveling blocks fell on the driller, killing him. A medical examiner later determined that the driller had significant quantities of methamphetamine in his blood at the time of the accident.

The Occupational Safety and Health Administration (OSHA) suspended operations for 12 days while it investigated the accident. In its June 19, 2014 technical report, OSHA explained that the accident resulted from fatigue failure of the drilling line—a progressive failure occurring over time. The report concluded that "[a] proper 'cut and slip' program, visual inspection and attention to the ton-mile history of the rope would have limited the wear accumulated by this drill line."[1] App. vol. 15B, 3469. OSHA thus issued Dan D. a citation for failing to inspect and properly maintain the drilling line. Dan D. and OSHA settled the citation, and OSHA reduced the fine in return for Dan D. taking corrective actions at the drill site.

Following OSHA's investigation, Sundance replaced Tres' company man. Under the new company man's supervision, Dan D. attempted to fish out the drill pipe stuck in the Rother well. But the wellbore had deteriorated during the 12-day shutdown, making it impossible to remove the drill pipe. Sundance ultimately decided to plug and abandon the Rother well, resulting in a total loss of the hole.

Sundance sued Dan D. for damages, asserting that Dan D.'s negligence, gross negligence, and breach of implied contract to drill the well in a workmanlike manner resulted in the loss of the hole. Before trial, Dan D. filed several motions in limine, including one objecting to the admission of two OSHA narratives as hearsay, and one objecting to the admission of toxicology evidence showing that the deceased driller had methamphetamine in his blood at the time of his death. The district court denied

---

[1] Slipping and cutting is a process used to repair worn portions of the line that is generally performed before the start of each new well.

the motion to suppress the toxicology evidence, and denied in part the motion to suppress the OSHA narratives, agreeing to admit only certain portions of those documents.

At the subsequent jury trial, Sundance offered testimony indicating that a driller typically keeps a log of the drilling line's "ton miles," i.e., the work done by the line, as measured by the load lifted in tons and the distance lifted or lowered in miles. In fact, Sundance's expert testified, Dan D.'s failure to track and log the ton miles of the drilling line used at the Rother well was "unheard of" in the industry. App. vol. 11, 2072. The expert further opined that Dan D. should have slipped and cut the drilling line before or during the drill to prevent the accident. Sundance relied on this testimony at closing to argue that Dan D.'s gross negligence caused the line's failure or, alternatively, that Dan D. breached an implied contract to drill the Rother well in a workmanlike manner. And, Sundance maintained, the ensuing 12-day shutdown caused the wellbore deterioration and ultimately resulted in the total loss of the hole.

For its part, Dan D. argued in closing that the jury should attribute most of the fault not to Dan D., but to Tres and its company man. In any event, Dan D. asserted, the exculpatory provisions provided in the IADC standard contract—which state that Sundance is liable for any damage to or loss of the hole, including any loss resulting from Dan D.'s gross negligence—formed part of an implied contract between Dan D. and Sundance. And under these provisions, Dan D. maintained, it wasn't liable for the loss of the well.

Dan D. also argued to the district court that Sundance owed a non-delegable duty to Dan D., and, accordingly, that any negligence of its independent contractor—i.e., Tres—was imputable to Sundance. But when Dan D. asked the district court to instruct the jury that it should therefore impute any of Tres' negligence to Sundance, the district court denied its request, noting that it "just didn't see sufficient evidence that this was a non-delegable duty." App. vol. 11, 2143. And over Dan D.'s objection, the district court instructed the jury that if it found Dan D. was grossly negligent, the jury shouldn't consider whether an implied contract between the parties incorporated the exculpatory provisions of the IADC standard contract. The district court based this instruction on its understanding that, under Oklahoma law, a provision that ostensibly exculpates a grossly negligent party from liability is invalid and unenforceable.

The jury returned a verdict in favor of Sundance, finding that Dan D. was grossly negligent and breached an implied contract to drill the hole in a workmanlike manner. And because the jury found Dan D. grossly negligent, the jury didn't consider whether the implied contract incorporated the exculpatory provisions of the IADC standard contract. Ultimately, the jury attributed 75% of the loss to Dan D.'s negligence and 25% of the loss to Tres' negligence and awarded Sundance $1.2 million in damages.

Dan D. filed a motion for a new trial under Federal Rule of Civil Procedure 59(a), arguing the court erred by (1) precluding the jury from considering whether the exculpatory provisions in the IADC form were part of the implied contract; (2) ruling

6

that Sundance didn't have a non-delegable duty to Dan D. and that Tres' negligence therefore wasn't imputable to Sundance; and (3) admitting the toxicology evidence and the OSHA narratives. The district court denied the motion and Dan D. appealed that order.[2]

Sundance then filed a motion for attorney's fees under Okla. Stat., tit. 12, § 940(A), which allows a prevailing party to collect reasonable attorney's fees in "any civil action to recover damages for the negligent or willful injury to property." The district court concluded that § 940(A) applied because Sundance brought this civil action to recover damages for Dan D.'s negligent injury to the Rother well. Thus, the court awarded Sundance attorney's fees. Dan D. also appealed that order, and we consolidated the two appeals.

## DISCUSSION

### I. The district court didn't err in instructing the jury.

Dan D. first argues that the district court erred in (1) instructing the jury that it need not decide whether the allocation of risk provisions formed part of the implied contract if it found Dan D. was grossly negligent, and (2) refusing to instruct the jury that it should impute Tres' negligence to Sundance. We "review for abuse of

---

[2] In its first Notice of Appeal, Dan D. indicated that it was appealing only the district court's order denying its motion for a new trial, rather than the district court's entry of judgment on the jury verdict. A notice of appeal designating a ruling on a postjudgment motion is typically sufficient to appeal the judgment itself. *See, e.g.*, *Jones v. Nelson*, 484 F.2d 1165, 1168 (10th Cir. 1973); *Cheney v. Moler*, 285 F.2d 116, 117-18 (10th Cir. 1960). Accordingly, "we will treat this appeal as if" Dan D. took it "from the entry of judgment on the jury verdict." *Grubb v. Fed. Deposit Ins. Corp.*, 868 F.2d 1151, 1154 n.4 (10th Cir. 1989).

7

discretion a district court's decision not to give a tendered jury instruction" and "review de novo whether the instructions as a whole accurately informed the jury of the governing law." *Sherouse v. Ratchner*, 573 F.3d 1055, 1060 (10th Cir. 2009). An incorrect jury instruction "requires reversal, however, 'only if the error is determined to have been prejudicial, based on a review of the record as a whole.'" *Id.* at 1059 (quoting *Durfinger v. Artiles*, 727 F.2d 888, 895 (10th Cir. 1984)).

### A.     The Gross-Negligence Instruction

The jury found Dan D. was grossly negligent—i.e., that Dan D. failed to act with even "slight care and diligence." Okla. Stat. tit. 25, § 6. And the district court instructed the jury that if it so found, it shouldn't consider whether any implied contract between the parties included the exculpatory provisions of the IADC form contract. To support this instruction, the district court explained that "the last word[] in the Oklahoma Supreme Court was that gross negligence was sufficient to vitiate an exculpatory clause." App. vol. 11, 2145. Dan D. disagrees, arguing that the district court's gross-negligence instruction was erroneous because provisions exculpating gross negligence aren't per se invalid under Oklahoma law. Consequently, Dan D. argues, the district court should have granted it a new trial on this basis.

In this diversity action, we look to the rulings of the Oklahoma Supreme Court to determine the applicable law governing the enforceability of exculpatory provisions, "and, if no such rulings exist, [we] must endeavor to predict how that high court would rule." *See Johnson v. Riddle*, 305 F.3d 1107, 1118 (10th Cir. 2002). In its order denying Dan D.'s motion for a new trial, the district court relied on

8

*Schmidt v. United States*, 912 P.2d 871 (Okla. 1996), as the most relevant case governing exculpatory provisions in Oklahoma. There, the United States District Court for the Western District of Oklahoma certified a question to the Oklahoma Supreme Court regarding whether an exculpatory clause was valid and enforceable. *Id.* at 872.[3] In answering that question, the court held in part that "exculpatory clauses cannot relieve one from liability for fraud, willful injury, *gross negligence* or violation of the law." *Id.* (emphasis added). It later reiterated that an exculpatory "clause will *never* avail to relieve a party from liability for intentional, willful or fraudulent acts or *gross, wanton negligence*." *Id.* at 874 (second emphasis added).

Despite the breadth of the Oklahoma Supreme Court's statements in *Schmidt* and their seemingly clear application to the case at hand, Dan D. insists these statements were mere dicta because the underlying facts in the case involved ordinary (not gross) negligence, and thus the statements weren't essential to its holding. But in *Schmidt*, the Oklahoma Supreme Court didn't rule on the merits of the underlying case, which arguably involved only ordinary negligence. *See* 912 P.2d at 872. That was the task of the Western District of Oklahoma. Instead, the Oklahoma Supreme Court answered a

---

[3] Although *Schmidt* dealt solely with a personal injury claim, *see* 912 P.2d at 872, rather than negligent destruction of property, Dan D. doesn't argue that Oklahoma law would distinguish between the two types of injuries. Moreover, in concluding that exculpatory clauses can't relieve one from liability for acts of gross negligence, the Oklahoma Supreme Court cited approvingly cases that examined such clauses in contexts outside of personal injury claims. *See id.* at 874 & n.15 (citing *Wolf v. Ford*, 644 A.2d 522, 528 (Md. 1994) (bad stock market investments); *Manhattan Co. v. Goldberg*, 38 A.2d 172, 174 (D.C. 1944) (loss of property)). Accordingly, we find *Schmidt* informative, notwithstanding the different injuries involved.

certified question about the validity of exculpatory clauses under Oklahoma law generally. Its statements that exculpatory clauses can't relieve one from liability for gross negligence were therefore essential to its holding in fully answering that question. Thus, we decline to treat the statements as dicta. Moreover, even if we characterize the Oklahoma Supreme Court's comments as dicta, those comments are nonetheless good indicators of "how that high court would rule." *See Johnson*, 305 F.3d at 1118.

Dan D. further argues that what it characterizes as *Schmidt*'s dicta shouldn't control this case because the Oklahoma Supreme Court has repeatedly used the term "gross negligence" imprecisely—sometimes to refer to acts that are comparable to willful conduct, and sometimes to refer to conduct that is simply a step above ordinary negligence. Thus, Dan D. maintains, *Schmidt* "is unclear and not a reliable source of Oklahoma law." Aplt. Br. 16. But as Sundance points out, Okla. Stat., tit. 25 § 6 has long defined gross negligence as "the want of slight care and diligence."[4] And we see no indication that the Oklahoma Supreme Court misapplied this well-established statutory definition when answering the certified question in *Schmidt*.[5]

---

[4] This is the same standard the jury applied in the instant case. *See* App. vol. 4, 812 (instructing jury that "[g]ross negligence is the failure to exercise slight care and diligence").

[5] The district court also relied on the Oklahoma Supreme Court's pre-*Schmidt* decision in *Elsken v. Network Multi-Family Sec. Corp.*, 838 P.2d 1007 (Okla. 1992). There, the court noted that "[c]ourts have refused to uphold limitation of liability clauses where the defendant's conduct constituted gross negligence." *Id.* at 1009. Dan. D. characterizes this remark as dicta. We need not decide what weight to give this statement, however, because *Schmidt* settled any lingering questions left by *Elsken*.

Dan D. also offers what it characterizes as multiple "[c]ompelling [r]easons" to conclude that the Oklahoma Supreme Court wouldn't invalidate the provisions contained in section 14 of the IADC form contract. Aplt. Br. 16. For example, Dan D. argues that (1) the court has routinely expressed a desire to allow parties the freedom to contract; (2) the provisions are industry standard; (3) the exculpatory provisions run both ways; (4) under Oklahoma law, gross negligence differs from negligence only in degree and not in kind; and (5) the exculpatory provisions avoid lengthy and expensive litigation.

Even if these points have some appeal, they aren't enough to overcome *Schmidt*'s clear directive. *See Flores v. Monumental Life Ins. Co.*, 620 F.3d 1248, 1250 (10th Cir. 2010) ("As a federal court sitting in diversity, our task is 'simply to "ascertain and apply"' Oklahoma law, attempting to 'predict what the state's highest court would do' if faced with the specific issues before us on appeal." (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003))). Because *Schmidt* controls, we decline to set aside the jury verdict based on the gross-negligence instruction.[6]

---

[6] Dan D. filed a motion asking this court to certify the gross-negligence question to the Oklahoma Supreme Court. Oklahoma allows for such a procedure "if the answer may be determinative of an issue" and "there is no controlling decision of the Supreme Court or Court of Criminal Appeals, constitutional provision, or statute of this state." Okla. Stat., tit. 20, § 1602; *see also* 10th Cir. R. 27.2 (allowing certification). But we have cautioned that "we apply judgment and restraint before certifying," and that "we will not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks." *Pino v. United States*, 507 F.3d 1233, 1236 (10th Cir. 2007). Instead, "[w]hen we see a reasonably clear and principled course, we will seek to follow it ourselves." *Id.* For the reasons discussed, *Schmidt* answered the question Dan D. seeks to certify, *see* 912 P.2d at 872, 874, and we deny Dan D.'s motion.

## B. The Non-Delegable-Duty Instruction

Dan D. proposed two jury instructions that would have directed the jury to impute Tres' negligence to Sundance because, Dan D. argued, Sundance owed a non-delegable duty to Dan D. The district court disagreed that Sundance owed Dan D. a non-delegable duty and thus declined to give the proposed instructions. Dan D. insists the district court's reasoning was flawed under Oklahoma law. And Dan D. argues the district court should have thus granted it a new trial on this basis. But even if we agree with Dan D. that the district court erred by not instructing the jury on the non-delegable duty rule, the error didn't prejudice Dan D. *See McInnis v. Fairfield Cmtys., Inc.*, 458 F.3d 1129, 1140 (10th Cir. 2006) (explaining that failure to give jury instruction is reversible only if prejudicial).

Sundance sought relief on two separate theories: gross negligence and breach of implied contract. As the district court noted, the jury found for Sundance on both claims. And the jury's verdict for Sundance on the breach of implied contract claim independently supports the jury's award of damages, because under Oklahoma law there is no reduction of damages for a breach of contract claim in light of a party's contributory negligence. *See* Okla. Stat. tit. 23, § 21 (stating that the measure of damages for a breach of contract "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby"); *Chi., R.I. & P. Ry. Co. v. Rogers*, 159 P. 1132, 1133 (Okla. 1916) (explaining that contributory negligence doesn't apply to contractual relations); *see also Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324, 1337 (10th Cir. 1984) (concluding that district court didn't err in

failing to reduce plaintiff's breach of contract damages in light of its contributory negligence "because contributory negligence has no place in contract and fraud actions").

Accordingly, regardless of whether the jury imputed Tres' negligence to Sundance or if imputation might have affected the underlying negligence award, any error in the district court's refusal to instruct the jury that Sundance owed a non-delegable duty to Dan D. wasn't prejudicial because such imputation wouldn't have affected the breach of contract award.

Dan D. nonetheless argues that the court's failure to give the instruction was prejudicial because "if the implied contract was to drill the well safely and [the company man's] and Tres' actions were imputable to Sundance, then" the district court should have instructed the jury "that such failure[s] by Sundance's representatives were themselves breaches of the contract, thereby precluding any recovery on the contract claim." Aplt. Br. 22.

Although Dan D. challenges on appeal the gross-negligence jury instructions, Dan D. doesn't otherwise challenge the instructions related to the terms of the implied contract. And the jury's verdict in light of those unchallenged instructions establish that the only terms of the implied contract at issue—notwithstanding the applicability of section 14 of the IADC form—were that Dan D. would drill the Rother well in a good and workmanlike manner and that Sundance would pay Dan D. for its work. There is simply no basis for Dan D.'s assertion that *Sundance* had a duty to drill the well safely. Thus, we disagree with Dan D.'s assertion that if the non-

13

delegable duty rule applied, then the district court would have instructed the jury "that [any] failure[s] by Sundance's representatives were themselves breaches of the contract." Aplt. Br. 22. Accordingly, we also decline to set aside the jury verdict based on the non-delegable-duty instruction.

## II.    The district court didn't err in admitting the OSHA narratives or the toxicology evidence.

Dan D. next argues that the district court erred by admitting the OSHA narratives and the toxicology evidence. "We review a district court's rulings on evidentiary matters and motions in limine for abuse of discretion." *Seeley v. Chase*, 443 F.3d 1290, 1293 (10th Cir. 2006). If the district court erroneously admitted evidence, we will set aside a jury verdict "only if the [admission] prejudicially affects a substantial right of a party." *Id.* Erroneously admitted evidence is prejudicial "if we can reasonably conclude that without the evidence, there would have been a contrary result." *Id.* (quoting *Smith v. Atl. Richfield Co.*, 814 F.2d 1481, 1487 (10th Cir. 1987)).

Sundance submitted to OSHA a Freedom of Information Act request and received two narratives relating to the accident, including one labeled "Fatality Narrative" and one labeled "Safety Narrative." App. vol. 14, 2708, 2718. Dan D. argues these two narratives were inadmissible because they are untrustworthy. *See* Fed. R. Evid. 803(8)(B) (stating that the rule against hearsay doesn't exclude a record or statement of public office unless opponent shows "that the source of information or other circumstances indicate a lack of trustworthiness"). And Dan D. argues that

14

the erroneous admission of the OSHA narratives was prejudicial because no other admitted evidence included the derrick hand's statements that (1) he "heard popping noises" coming from the drilling line when the drill pipe was stuck, and (2) he told his supervisor about those noises prior to the accident. App. vol. 14, 2716.

The district court also admitted a medical examiner's video deposition and his corresponding report indicating there was methamphetamine in the deceased driller's blood at the time of the accident. Dan D. argues this evidence is irrelevant and inadmissible under Federal Rule of Evidence 401 because there is no reasonable certainty that the driller was impaired at the time of the accident and because there is no reasonable link between the presence of methamphetamine in the driller's blood and the accident. Dan D. also argues that, even if relevant, this evidence is inadmissible under Federal Rule of Evidence 403 because its probative value is substantially outweighed by the danger of unfair prejudice; according to Dan D., methamphetamine use "is particularly inflammatory in today's culture." Aplt Br. 25. And Dan D. argues the erroneous admission of this evidence was prejudicial because the evidence represented the "critical tipping point" for the jury. *Id.*

We decline to consider whether the narratives were untrustworthy under Rule 803(8)(B) or whether the methamphetamine evidence was irrelevant under Rule 401 or unduly prejudicial under Rule 403. Even if we assume the district erred in admitting this evidence, Dan D. hasn't established that, but for the alleged errors, "we can reasonably conclude that . . . there would have been a contrary result" at trial. *Seeley*, 443 F.3d at 1293 (quoting *Smith*, 814 F.2d at 1487).

15

For one, the district court also admitted into evidence both the OSHA citation and the June 19, 2014 technical report and Dan D. doesn't challenge their admission on appeal. The citation indicated that Dan D. committed a "[s]erious" violation by failing to adequately inspect and maintain the drilling line "to eliminate failure of [the] drilling line wire rope[,] which expose[d] employees to struck-by hazards during oil/gas drilling operations." App. vol. 13B, 2695. Moreover, the June 19, 2014 technical report and other testimony at trial established that Dan D. failed to keep track of the accumulated ton-miles on the drilling line, an oversight that one expert testified was "unheard of" in the industry. App. vol. 11, 2072. And Dan D.'s own president admitted that Dan D. failed to properly slip and cut the line. Finally, Sundance presented evidence demonstrating that the deceased driller ignored instructions to stop pulling on the stuck drill pipe, and that during his subsequent, unauthorized attempts to remove the pipe, the drilling line failed.

In short—even setting aside the OSHA narratives and toxicology evidence—Sundance presented overwhelming evidence to the jury of Dan D.'s failure to inspect and maintain the drilling line, and of the driller's continued, unauthorized attempts to free the stuck drill pipe. There is no basis for concluding that the jury would have granted Dan D. a favorable verdict but for the admission of the OSHA narratives and methamphetamine evidence. Thus, we decline to set aside the jury verdict based on the admission of the OSHA narratives and the toxicology evidence.

**III.    The district court properly awarded Sundance attorney's fees.**

Finally, Dan D. argues that the district court erred in awarding Sundance attorney's fees. "In diversity cases, attorney['s] fees are a substantive matter controlled by state law," and "[w]e review the legal principles underlying an award de novo." *Combs v. Shelter Mut. Ins. Co.*, 551 F.3d 991, 1001 (10th Cir. 2008).

In any civil action brought under Oklahoma law "to recover damages for the negligent or willful injury to property and any other incidental costs related to such action, the prevailing party shall be allowed reasonable attorney's fees." Okla. Stat. tit. 12, § 940(A).[7] The use of the word "shall" renders the award of attorney's fees mandatory when an action falls under the purview of § 940(A). *See Schaeffer v. Shaeffer*, 743 P.2d 1038, 1040 (Okla. 1987).

Sundance requested attorney's fees under this statute, arguing that the loss of the hole is the type of damage that squarely falls within § 940(A). Sundance explained that § 940(A) applies to actions involving the negligent destruction of a wellbore, relying on *Parks v. American Warrior, Inc.*, 44 F.3d 889 (10th Cir. 1995), *Marino v. Otis Engineering Corp.*, 839 F.2d 1404 (10th Cir. 1988), and *Busby v. Canon Well Services, Inc.*, 771 P.2d 1016 (Okla. Civ. App. 1989). The district court agreed, finding that the "negligent destruction of an oil and gas well falls within the

---

[7] Dan D. doesn't challenge the reasonableness of the amount awarded, but rather only argues that Sundance wasn't entitled to attorney's fees in the first instance. We thus limit our discussion to the legal question, and express no opinion as to the reasonableness of the actual award.

scope of § 940(A)," and that Sundance, as the prevailing party, was entitled to attorney's fees. App. vol. 5, 1068 (quoting *Parks*, 44 F.3d at 892).

In challenging the award of attorney's fees, Dan D. argues § 940(A) applies only to actions involving physical damage to property, not to actions involving "property rights" generally. Aplt. Br. 26 (quoting *Woods Petrol. Corp. v. Delhi Pipeline Corp.*, 700 P.2d 1011, 1012 (Okla. 1984)). Dan D. thus attempts to distinguish the cases Sundance relies on, suggesting those case "involved claims of damages stemming from actual physical injury to the well, namely damages to the producing formations and reserves." *Id.* at 27. And "because there was no evidence here of damage to the producing formation or loss of reserves," Dan D. maintains that § 940(A) doesn't apply to the facts of this case. *Id.* at 28.

Although we agree that *Woods Petroleum* made clear that § 940(A) is limited to "actions for damages for the negligent or willful *physical* injury to property," 700 P.2d at 1013, we disagree that this holding precludes attorney's fees in this case. In *Woods Petroleum*, the Oklahoma Supreme Court reversed an award of attorney's fees in an action involving the defendant's negligent operation of a flow meter, which resulted in a miscalculation of the amount of gas sold to the defendant. *Id.* at 1012-13. The Oklahoma Supreme Court held that § 940(A) didn't apply because the Oklahoma legislature didn't intend that section to encompass actions involving interference with all property rights, but rather to encompass only actions involving "*physical* negligent or willful injury to property." *Id.* at 1012.

18

In that regard, *Woods Petroleum*'s facts are distinguishable from the facts here. Sundance's recovery here stemmed not from a mere interference with property rights as in *Woods Petroleum*, but from the physical deterioration of the Rother well during the 12-day OSHA investigation. This is precisely the type of "*physical* injury to property" to which the *Woods Petroleum* court indicated § 940(A) would apply. *See id.* at 1013.

Indeed, notwithstanding Dan D.'s efforts to distinguish *Marino* and *Busby*, we find those opinions particularly instructive. In *Marino*, a well owner brought an action against the manufacturer that made and installed a "packer" device in its well. 839 F.2d at 1406. After the device became stuck and subsequent attempts to remove it destroyed the well, the well owner sought damages against the manufacturer. *Id.* at 1405-06. The jury returned a verdict for the manufacturer, which then sought attorney's fees under § 940(A). *Id.* at 1412. On appeal, we distinguished *Woods Petroleum*, concluding that § 940(A) applied because the well owner's alleged injury arose from physical damage. Specifically, we explained that the plaintiff's "allegations center around the *physical injury to property* and thus fall within the mandatory coverage of § 940(A) authorizing the recovery of attorney's fees." *Id.* at 1412-13 (emphasis added).

Similarly, in *Busby* an owner of an oil and gas well hired a contractor to fracture the well, but the contractor allegedly used the wrong chemical agent, resulting in a total loss of the well. 771 P.2d at 1016. The owner brought an action for breach of contract or in the alternative negligence, but the jury found in favor of

the contractor. *Id.* The contractor then sought attorney's fees under § 940(A), and on appeal the Oklahoma Court of Appeals held that section applied. *Id.* at 1016-17. That court also distinguished *Woods Petroleum*, explaining:

> The *Woods* decision did not find that oil or gas was not "property" under the provisions of § 940(A), but rather *found that the required physical injury to the property was not present.* In [the well owner's] action against [the contractor], damages were sought for negligent destruction of the oil and gas well. In awarding attorney['s] fees to [the contractor] under the provisions of § 940(A), the trial court *was presented with actual injury to the property itself, and not the broader field of rights in property found to be outside the meaning of § 940(A)* in *Woods Petroleum* . . . .

*Id.* at 1017 (emphasis added).

Dan D. argues that these cases are distinguishable because they involved "damages to producing formations and reserves." Aplt. Br. 27. We disagree. In concluding that § 940(A) applied, neither *Marino* nor *Busby* relied on whether the producing formations and reserves sustained damage; rather, both courts looked to whether the property at issue sustained *physical* injury. *See Marino*, 839 F.2d at 1412-13; *Busby*, 771 P.2d at 1017. Here, as in *Marino* and *Busby*, but unlike in *Woods Petroleum*, Sundance sought damages resulting from the *physical* injury to an oil and gas well: namely, the deterioration of the wellbore during the 12-day OSHA investigation. Sundance, as the prevailing party, was thus entitled to reasonable attorney's fees. *See Marino*, 839 F.2d at 1412-13 (explaining that in case involving negligent destruction of oil and gas well, award of attorney's fees to prevailing party under § 940(A) is "mandatory").

Affirmed.

20